Case No.: 20-55622

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

J.K.J, individually, and successor in interest to the Deceased Aleah Jenkins, by and through his guardian-ad-litem Jeremy Hillyer
,

*Plaintiff-Appellant,*

vs.

CITY OF SAN DIEGO, et al.,

*Defendants-Appellees.*

---

Appeal from the District Court for Southern District of California,
Case No. 3:19-cv-02123-CAB-RBB
Honorable Cathy Ann Bencivengo United States District Judge

## APPELLANT J.K.J.'S OPENING BRIEF

Kaveh Navab, Esq (SBN: 280235)
NAVAB LAW, APC
13160 Mindanao Way, Suite 280
Marina Del Rey, California 90292
Telephone: 310.826.1002
Email: Navablaw@gmail.com

Neama Rahmani, Esq. (SBN. 223819)
H. Dean Aynechi, Esq. (SBN. 292229)
WEST COAST TRIAL LAWYERS, APLC
350 South Grand Avenue, Suite 3350
Los Angeles, California 90071
Telephone: (213) 927-3700
Email: filings@westcoasttriallawyers.com

*Attorneys for Plaintiff-Appellant.*

# **TABLE OF CONTENTS**

*Pages*

INTRODUCTION…………………………………………………………1

ISSUES PRESENTED…………………………………………………..3

JURISDICTIONAL STATEMENT……………………………………4

STATEMENT OF THE CASE…………………………………………4

FACTUAL AND PROCEDURAL BACKGROUND……………………………4

    Initial Pull Over of Cadillac, Search and Passengers Arrest………………..4

    Cancellation of Paramedics Call……………………………………………..5

    One Hour Drive to San Diego Police Department Headquarters……………8

    Ms. Jenkins' Condition Takes a Serious Turn for the Worst………………..8

    San Diego Police Department Headquarters………………………………12

    POST and San Diego Police Department Polices…………………………15

    District Court Proceedings…………………………………………………16

STANDARD OF REVIEW……………………………………………………19

SUMMARY OF THE ARGUMENT…………………………………………..20

ARGUMENT…………………………………………………………..22

    A.    The District Court Erred by Finding that the First Amended
           Complaint Did Not State a Plausible Claim for Denial of
           Medical Care Against Taub and Durbin……………………………22

        1. Officer Durbin Acted with Deliberate Indifference

          Toward Ms. Jenkins……………………………………………23

        2. Officer Taub Acted with Deliberate Indifference Toward

          Ms. Jenkins…………………………………………………….31

    B.    The District Court Erred in Finding that Durbin and Taub are
           Entitled to Qualified Immunity……………………………………...33

C.     The District Court Erred in Not Analyzing the Denial of Medical Care Claim Under the Fourth Amendment………………...39

D.     The District Court Erred in Dismissing Appellant's Deprivation of Life Without Due Process Claim……………………42

E.     The District Court Erred in Dismissing Appellant's *Monell* Municipal Liability Claim……………………………………………...43

F.     Appellant Has Standing to Assert and is Entitled to All Damages Pled and Set Forth in the FAC……………………………49

G.     The District Court Erred When It Found that the Allegations in the FAC Were "Superfluous" In Light of the Durbin's Body Cam Footage Being Incorporated into the FAC………………54

CONCLUSION………………………………………………………...57

STATEMENT OF RELATED CASES………………………………………..57

CERTIFICATE OF COMPLIANCE………………………………………...58

CERTIFICATE OF SERVICE………………………………………………59

# TABLE OF AUTHORITIES

**CASES**                                                        **PAGE**

*Agyeman v. INS* 296 F.3d  (9th Cir. 2002).....................................................20

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)......................................................35

*Bell Atlantic Corp.* v. *Twombly*,
    550 U.S. 544, 570 (2007)..............................................................2,31

*Board of County Comm'rs of Bryan Cty., Okl. v. Brown*,
    520 U.S. 397,407(1997).....................................................................45

*Campos v. Cty. of Kern*, 2017 WL 915294 at *8
    (E.D. Cal. Mar.17 2017)...................................................................52

*Carey v. Piphus*, 435U.S.247 (1978)............................................................50

*Castro v. County of Los Angeles*,
    833 F.3d 1060 (9th Cir.2016)..............................................21,23,24,40

*Chaudhry v. City of Los Angeles,*
    751 F.3d 1096 (9th Cir. 2014)……....................................................51

*Christie v. Iopa*,
    176 F.3d 1231, 1234-1240 (9th Cir. 1999).......................................44

*City of Revere v. Mass. Gen. Hosp.*,
    463 U.S. 239,244(1983)....................................................................42

*Cty. of Sacramento v. Lewis*,
    523 U.S. 833, 847(1998)...................................................................52

*Clouthier v. County of Contra Costa*,
    591 F.3d 1232, 1250 (9th Cir. 2010)...............................................44

iv

**CASES**                                                           **PAGE**

*Cotton ex rel. McClure v. City of Eureka,*
860 F.Supp.2d 999, 1014 (N.D. Cal.2012)....................................................52

*Curnow v. Ridgecrest Police,*
    952 F.2d 321, 325 (9th Cir.1991)........................................................52

*C.V. by & through Villegas v. City of Anaheim,*
    823 F.3d 1252, 1255 (9th Cir. 2016)...................................................34

*Dang v. Cross,* 422 F.3d 800, 807 (9th Cir. 2005)......................................50

*Deorle v. Rutherford,*
272 F.3d 1272, 1285-1286 (9th Cir. 2001)...................................................35

*Dougherty v. City of Covina*
    F.3d 892, 897 (9th Cir.2011)..........................................................20,43

*Estate of Lawson ex rel. Fink v. City of Hamilton,*
    2009 WL 1444556, at *17 (S.D. Ohio May 21, 2009).....................37

*Estate of Levingston v. County of Kern,* 2018
    WL 1335410 (E.D. Cal. Mar.15, 2018)......…..................................37,38

*Estate of Mendez v. City of Ceres,*
    390 F.Supp.3d 1189, 1207-1208 (E.D. Cal. 2019) ...........................44

*Fonseca v. City of Fresno,*
    2012 U.S. Dist. LEXIS 2327, 23–25 (E.D.Cal. Jan. 9).....................42

*Fontana v. Haskin,*
262 F.3d 871, 879 & n.4 (9th Cir. 2001).......................................................40

*Freeman v. DirecTV, Inc*
    457 F.3d 1001, 1004 (9th Cir.2006)..................................................20

*Frost v. Agnos,* 152 F.3d 1124 (9th Cir. 1998)…………………....…....37,41

**CASES** **PAGE**

*Gibson v. Cty. of Washoe, Nev.,*
   290 F.3d 1175, 1187 (9th Cir. 2002)..............................................37,41

*Gordon v. County of Orange*,
   888 F.3d 1118, 1125 (2018)............................................................23,39

*Graham v. Connor*, 490 U.S. 386, 395 (1989)............................................40

*Guyton v. Phillips*,
   532 F.Supp. 1154,1167-1168 (N.D. Cal. 1981)...........................50,51

*Hall v. County of Nemaha,*
   509 F. Supp. 2d 821, 832 (D. Neb. 2007) .........................................37

*Hallet v. Morgan*, 296 F.3d 732 (9th Cir. 2002).......................................24

*Hayes v. Cnty. of San Diego*,
   736 F.3d 1223, 1229-1230 (9th Cir. 2013).......................................52

*Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).......................................34

*Henriquez v. City of Bell*,
   2015 WL 13357606 at *6 (C.D. Cal. 2015.......................................40

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982)……………………...……....…....27

*Hope v. Pelzer,* 536 U.S.730,741(2002)..................................................34,35

*In re Tracht Gut,*

*LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016)..................................................55

*Jessop v. City of Fresno*, 936
      F.3d 937, 940 (9th Cir. 2019).........................................................34

*Jett v. Penner,* 439 F.3d 1091 (9th Cir. 2006)……….........................24,29

**CASES**          **PAGE**

*Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015).........................................23

*Knievel v. ESPN,* 393 F.3d 1068, 1072 (9thCir.2005)..................................20

*Khoja v. Orexigen Therapeutics, Inc.,*
    899 F.3d 988, 1003 (9th Cir. 2018)....................................................55

*Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014)................................34

*Lawrence v. Dep't of Interior*
    525 F.3d 916, 920(9th Cir. 2008) ......................................................20

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*,
    113 S.Ct.  1160 (1993)........................................................................46

*Lewis v. United States* 641 F.3d 1174, 1176................................................20

*Lemire v. Cal. Dept. of Corrections and Rehabilitation supra,*
    726 F.3d at 1075.................................................................................52

*Lolli v. County of Orange*, 351 F. 3d 410 (9th Cir. 2003)……………........24

*Mackie v. Cty. of Santa Cruz,*
    444 F.Supp.3d 1094, 1112 (USDC N.D. Cal. 2020)..................43,44

*Marsh v. Cnty. of San Diego,* 680 F.3d 1148, 1159 (9th Cir. 2012).............44

*McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992)......................24,37

*Mejia v. City of San Bernardino,*
    2012 WL 1079341 (C.D.Cal. Mar. 30, 2012)...................................42

*Niblett v. City of Ceres*, 327 F.Supp.3d 1261, 1285 (E.D. Cal. 2018).........50

*Ostling v. City of Bainbridge Island*,
    872 F. Supp. 2d 1117 (W.D. Wash. 2012)…....................................42

**CASES**                                                          **PAGE**

*Ovando v. City of Los Angeles*,
    92 F.Supp.2d 1011, 1018-1019 (C.D. Cal. 2000)............................52

*Pearson v. Callahan*, 555 U.S. 223 (2009)………………......………....34

*Peraza v. Delameter*, 722 F.2d 1455 (9th Cir. 1984)....................................54

*Porter v. Osborn,* 546 F.3d 1131, 1137 (9th Cir. 2008)...............................54

*Prison Legal News v. Lehman*, 397 F.3d 692 (9th Cir. 2005).....................35

*Pryor v. Dearborn Police Dep't*,
    452 F. Supp. 2d 714, 719–21 (E.D. Mich. 2006)................................38

*Raymond v. Martin*,
    2018 WL 4560686 (E.D. Cal. Sept. 20, 2018)....................................49

*Robins v. Harum*, 773
F.2d 1004, 1009 (9th Cir. 1985)......................................................................40

*Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011..........................…… 46

*Stilwell v. Smith & Nephew, Inc.*
    482 F.3d 1187, 1193. (9th Cir. 2007) ..................................................20

*Tatum v. City and County. of S.F.,*
    441 F.3d 1090, 1098–99 (9th Cir.2006)..................................39,41,50

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308, 322 (2007)............................................................19,55

*Torres v. City of Madera,* 524 F.3d at 1056 (9th Cir. 2008)........................41

*Von Haar v. City of Mt. View,*
    2011 WL 782242 (N.D.Cal. Mar. 1, 2011).......................................42

**CASES**                                                         **PAGE**

*Wheeler v. City of Santa Clara*,
F.3d 1046, 1957-1958 (9th Cir. 2018)...................................................52

*Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)...............................52

*Wilson v. Lynch* 835 F.3d 1083, 1090 (9th Cir. 2016)..................................20

**STATUTES**

California Code of Civil Procedure

§337.32...............................................................................................49

§377.11...............................................................................................49

§337.20……………………………………………………...................50,51

§377.30...........................................................................................50,51

§337.34……………………………….....………………………………50,51

Federal Rule of Civil Procedure

Rule8 (a)……………………………………………………….. ……..46

Rule12(b)(6)......................................................................................19

42U.S.C1983......................................................................................3,4

# INTRODUCTION

On May 9, 2019, due to San Diego Police Officers Lawrence Durbin (hereinafter "Durbin") and Jason Taub's (hereinafter "Taub") failure to summon immediate medical care for Aleah Jenkins (hereinafter "Ms. Jenkins") after she vomited, repeatedly plead for assistance saying she was "sick", screaming  "help me please…help me…I'm telling you I can't", and exhibiting clear and unambiguous signs of a serious medical need at the scene of her arrest, during the entirety of the over one hour drive while handcuffed in the back of Durbin's patrol vehicle and while at the San Diego Police Department Headquarters ("Headquarters"), Ms. Jenkins needlessly died. Revealingly, while still at the scene of the arrest after observing Ms. Jenkins vomit, dry-heave, be visibly disoriented, and hunching over while handcuffed Taub made the call for paramedics, however, Durbin deliberately and recklessly—while faced with clear signs of Ms. Jenkins' serious medical need—shouted to Taub "don't worry about it", to get Taub to cancel the paramedics, which Taub immediately did. Under the totality of the circumstances, both Durbin and Taub knew that Ms. Jenkins needed immediate medical attention yet acted deliberately indifferent to her medical needs.

As demonstrated on Durbin's bodycam footage (which was incorporated by reference into the Appellant's First Amended Complaint), for the entire duration of

1

over one-hour drive from the scene the arrest until arriving at the Headquarters, Durbin knowingly demonstrated deliberate indifference toward Mr. Jenkins' serious medical needs. The same is true once at the Headquarters, Ms. Jenkins' displayed obvious signs of medical needs when she could no longer stand and instead lay on the ground face first in and out of consciousness, panting, body twitching and shaking, and despite this Durbin made the deliberately indifferent decision to place her back in the patrol car handcuffed and face down for *eleven minutes and thirty seconds* only to return and find her no longer breathing.

Despite the ample evidence set forth in the First Amended Complaint ("FAC"), including the partial bodycam footage of the incident, the District Court erroneously dismissed the complaint—with no leave to file an amended complaint—by failing to view the facts in the light most favorable to Plaintiff-Appellant as required and established in *Twombly* and its progeny. Instead, Appellant maintains that the district court incorrectly applied the legal standard at the 12(b)(6) stage; draws inferences in favor of Appellees; ignored the more than sufficient evidence of deliberate indifference—particularly at the pleading stage— toward Ms. Jenkins' medical needs; disregarded the facts plead in the FAC by calling them "superfluous" and incorrectly found that qualified immunity applied to the Durbin and Taub's actions. When the proper legal standard is applied,

2

Appellant's FAC should not have been dismissed and should have been allowed to proceed to discovery. As such, Plaintiff-Appellant requests this Court reverse the district court's judgment and remanded the case for further proceedings.

## ISSUES PRESENTED

1. Whether the District Court erred in concluding that Appellant's First Amended Complaint did not state a claim against Appellees Durbin and Taub for denial of medical care pursuant to 42 U.S.C § 1983.

2. Whether the District Court erred in concluding that Appellees Durbin and Taub were entitled to qualified immunity as a matter of law.

3. Whether the District Court erred in failing to apply the Fourth Amendment standard to Appellant's denial of medical care claim pursuant to 42 U.S.C § 1983.

4. Whether the District Court erred concluding that Appellant's First Amended Complaint did not state a *Monell* claim pursuant to 42 U.S.C § 1983.

5. Whether Appellant is entitled to damages and relief as plead in the First Amended Complaint.

3

**JURISDICTIONAL STATEMENT**

Plaintiff filed this case in the U.S. District Court seeking relief pursuant to 42 U.S.C. Section 1983 and appeals the final judgment that entered on May 18, 2020 [1-ER-260-261] and Plaintiff timely filed his Notice of Appeal on June 16, 2020. [1-ER-262-267].

**STATEMENT OF THE CASE**

**FACTURAL AND PROCEDURAL BACKGROUND**

**Initial Pull over of Cadillac, Search of Passengers and Arrest**

On November 27, 2018, at approximately 3:52 p.m., Ms. Aleah Jenkins was the backseat passenger in a Cadillac vehicle pulled over by Officers Nicholas Casciola ("Casciola") and Taub for having expired registration. (1-ER-119:2-28.) Officer Lawrence Durbin ("Durbin") arrived soon after to provide cover for Casciola and Taub. (*Id.*) The front seat of the vehicle was occupied by two males who both had prior convictions for narcotics sales. (*Id.*) After being pulled out of the vehicle and while being handcuffed, the driver told the officers about his arrest/conviction for heroin sales. (*Id.*; video at 0:19-0:24[1].) At the time, while seated upright in the back seat, Ms. Jenkins was alert, responded

---

[1] The publicly available body cam video incorporated by reference into Plaintiff's FAC: **https://www.youtube.com/watch?v=-cx5dQ_u04k&has_verified=1**

to questioning from the officers and complied with their request to provide her name, date of birth, and informed them of her probation. (1-ER-119:13-120:19; video at 1:13-1:43.) Casciola, Taub and Durbin proceeded to search the vehicle while Mr. Jenkins and the other occupants were handcuffed and detained either in a patrol car or on the street. (1-ER-121:1-3). After the search and the questioning of the occupants of the vehicle, the information known to Casciola, Taub and Daub included: knowledge that the male occupants had prior arrests and/or convictions for narcotics sales, Ms. Jenkins' warrant, a saran wrap-like plastic (commonly used for narcotics sales); and a wallet with a lot of cash. (1-ER-119:13-120:19; video at 7:37-7:45.)

**Cancellation of Paramedics Call**

Ms. Jenkins was first placed in that back of Casciola's patrol vehicle and then moved to the back of Durbin's patrol vehicle and the door to the vehicle was closed. (1-ER-120:20-121:11). When being walked to Durbin's vehicle she was able to walk without assistance and without issue. (*Id.*) When Durbin returned to his patrol car some moments later, Ms. Jenkins, who was handcuffed in the back seat at the time, gestures to Durbin from inside the car for help and Durbin then notices that she has vomited on herself in the back seat of the patrol car. (*Id.*; video at 11:20-11:41.) Durbin then opened the back door of the vehicle and asking, "why

5

are you throwing up" and she responded, "I'm sick" as she is vomiting. (*Id*.)
Durbin then asked her again "why" and she again responds, "I'm sick" as she is
vomiting. (1-ER-121:12-20; video at 11:54-12:20.) While she continued to dry
heave and vomit, Durbin asked her if she was "withdrawing", and Taub stated if
she was "detoxing", to which she responds, "No, I'm sick my stomach is turning."
(*Id*.) Durbin then tells her to "stick your head out" as she continues to vomit and
dry heave leaning out of the car door while handcuffed. (*Id*.) She then tells Durbin
that she is pregnant while she is continuing to vomit. (*Id*.)

At 11:41 of the video footage from the body cam it indicates "Officer prepares
to request medics respond". (1-ER-121:21-22.) When Durbin first noticed the
vomiting, he requested that Taub call the paramedics. (1-ER-121:23-122:4; video
at 11:54-12:22.) Despite continuing to vomit, dry-heave, visibly disoriented,
exhibiting signs of distress by hunching over while handcuffed, deterioration of her
condition from moments prior when she was walking and standing, having glossy
eyes, trouble speaking, and incoherent statements, Durbin yells to Taub, who had
already placed the call to paramedics, "don't worry about it", to get Taub to cancel
the paramedics, which Taub immediately did. (1-ER-121:23-122:12.)

Durbin made the deliberately indifferent decision to instruct Taub to cancel the
call to paramedics despite the obvious serious medical emergency Ms. Jenkins was

6

suffering from. (1-ER-121:23-122:12.) A reasonable officer in both Durbin and
Taub's position when told by a handcuffed arrestee that she is "sick" and
"pregnant" while repeatedly vomiting would have immediately summoned medical
care, and not cancelled the paramedics after placing a call for medical assistance.
(1-ER-122:13-124:9.) Reasonable officers, in the position of officers like Durbin
and Taub, based on their Police Officer Standards and Training (hereinafter
"POST") and San Diego Police Department (hereinafter "SDPD") policies and
training know that it is their duty to ensure the safety of ill or injured persons, to
evaluate emergency situations, and to take necessary actions for the well-being of
the ill or injured person. (*Id*.) It is precisely for this reason, faced with clear and
objective signs of a medical emergency, that Durbin initially requested that
paramedics be called, only to order Taub to cancel the paramedics. (*Id*.) Moreover,
Durbin asked Ms. Jenkins if she was "withdrawing" when she was vomiting
because of the totality of the information before him. (*Id*.)

While Ms. Jenkins is in clear distress and suffering from a medical emergency
and has vomit on her, Durbin states that because she had once been arrested on her
twin sister's warrant, he needed to take her downtown for fingerprinting. (1-ER-
124:10-18). At approximately 4:05 p.m. (one hour after the traffic stop), Durbin
closes the rear door on Ms. Jenkins and begins driving toward the headquarters. (1-

7

ER-124:19-26.) Durbin then informs dispatch that he is leaving for the "HQ" with one adult female, and make no mention of her vomiting, that she is sick, and the objective signs she is overdosing. (*Id.*)

**One Hour Drive to San Diego Police Department Headquarters**

Based on Durbin's body cam, from approximately minute 14:15 (when he departed the arrest site) to approximately minute 45:00, Ms. Jenkins vocalized numerous objective signs that a reasonable officer in the same circumstances as Durbin would have known indicated that she needed medical attention and was overdosing. (1-ER-124:11-125:15.). In those thirty minutes, Ms. Jenkins continually groaned, panting at times, exhibited an abnormally rapid rate of breathing, screamed at times, stating she was "felling hot", and pled for water. (*Id.*) Moreover, based on Durbin's initial interaction with Ms. Jenkins when she was seated in the back of the Cadillac, a reasonable officer would have been able to tell from the totality of circumstances that her physical condition had significantly deteriorated and that she needed urgent and immediate medical attention. (*Id.*)

**Ms. Jenkins' Condition Takes a Serious Turn for the Worst**

From approximately minute forty-five (45:00) of Durbin's body cam, Ms. Jenkins' condition takes a turn for the worst and her continual groaning,

8

screaming, and panting increasing becomes louder. (1-ER-125:16-25; video 45:00-1:04.) In response to a loud scream, Durbin asks, "what's going on" and "Ms. Jenkins you still want water?" to which Decedent does not respond. (*Id*; video 46:34-47:25.) After a few moments go by, Durbin again says "Ms. Jenkins" and she responds by gasping and groaning. (*Id;* video 46:34-47:25.) Her unresponsiveness to questioning at times is an objective sign that she was experiencing a medical emergency and is contrary to Durbin's training and policy to not request immediate medical attention. (1-ER-125:26-126:3.) Durbin continues to drive and ignore the repeated groans, screams, panting, abnormally rapid rate of breathing and objective signs of medical distress and overdosing. (1-ER-126:4-17.) While at times Durbin attempts to engage in conversation, by informing her she can "sleep" and that they are "stuck in traffic", her barely audible responses, screams, and unresponsiveness, amounts to objective signs that her condition is deteriorating and needed immediate medical attention. (*Id*; video 45:00-1:04.) At times Decedent would scream loudly in distress, but Durbin would ignore her distressful screams and pleas. (*Id*; video 59:40-1:00.)

At approximately 1:04 (one hour and four minutes) of Durbin's body cam footage, she begins screaming very loudly and pleading, "please help me, please help me". (1-ER-126:4-17; video at 1:04-1:06.) Durbin responds, "what's going

9

on'', Ms. Jenkins who is panting and screaming, does not give audible responses but screams, "oh my god, please stop, stop, stop". (*Id*; video at 1:05:10.) When Durbin would ask Ms. Jenkins a question she would scream and pant in an effort to communicate her distress and need for medical help, yet Durbin ignored these objective signs. (*Id.*)

 At approximately 1:14 (one hour and fourteen) of Durbin's body cam, he decides to pull over his vehicle because Ms. Jenkins has not responded to his questions or comments for approximately ten (10) minutes since she last screamed "oh my god, please stop, stop, stop". (1-ER-126:18-22; video at 1:14:10.) Durbin pulls over, walks around to the back door, opens it, and finds her body laying down on the back seat, and part of her body falls out of the car door. (1-ER-126:23-127:14; video at 1:14:26-1:14:38.) At this moment, Ms. Jenkins is displaying objective signs of a serious medical, including, but not limited to panting, abnormally rapid rate of breathing, listless body, and unresponsiveness for approximately ten (10) minutes. (*Id.*) Durbin then says, "I need you to stay awake" and he places his hand on her to push her back into the car—a clear indication that he has an understanding that she is in distress by asking her to stay awake—and as he is pushing her back into the car she pleads with him "I'm sick" as he slams the door shut. (*Id.*; video at 1:14:26-1:14:38.) The fact that Durbin pulls over the car,

10

and then faced with the objective signs of a serious medical need and fails to summon or provide any medical are for Ms. Jenkins demonstrates his conscious, deliberate and reckless disregard for her serious medical needs. (*Id.*)

After slamming the door on her listless body, Ms. Jenkins screams "Help!" as Durbin walks back to the driver door saying, "Knock it off". (1-ER-128:8-16; video at 1:14:39-1:15:22.) Demonstrating his conscious and deliberate indifference again, Ms. Jenkins pleads "help me please" and Durbin says "you're fine" after having done nothing to evaluate her condition despite objective signs she was overdosing. (*Id.*) As Durbin continues to drive, Decedent continues to scream "help me…. I'm telling you I can't". (*Id.*)

During the over one-hour drive to the Headquarters, Ms. Jenkins condition objectively continued to deteriorate, displaying obvious signs of extreme physical distress and a serious medical need. (1-ER-128:17-22.) At no point did Durbin summon medical care, request assistance from other officers, inform dispatch that Ms. Jenkins may need medical attention, or take her to any number of hospitals on the route. (1-ER-128:23-129:2.)

**San Diego Police Department Headquarters**

Upon arriving at the station and opening the back door, Ms. Jenkins was lying face down in the back seat handcuffed, panting loudly, breathing at an abnormally rapid rate, demonstrating clear and objective signs she was overdosing and exhibiting a serious medical need. (1-ER-129:3-23; video 1:17:18-1:17:55.) In sign that Durbin was aware that she was exhibiting signs of a serious medical need, he immediately says to her, "stop hyperventilating…you are doing this to yourself". (*Id*; video 1:17:55-11:18:29.) As Durbin continues to stand over her, she continues to pant profusely, breath at an abnormally rapid rate and her body begins twitching and shaking while lying face down in the back seat. (*Id*; video 1:17:18-1:18:29.) At this juncture, despite the totality of the circumstances and the aforementioned objective signs of a serious medical need Durbin made no effort to summon paramedics, medical care, or have Jenkins evaluated by medical staff that was present at the station. (*Id*.)

Durbin then pulls her listless body out of the back of car, she screams in distress again, and continues to pant excessively and breathe in an abnormally rapid manner. (1-ER-129:24-130:6; 1:18:30-1:19:00.) He then lays her on the concrete ground as she again pleads "Help me", which prompts Durbin, who ignores her pleas for help, to say to the approaching DOE officer that "she doesn't want to go to jail". (*Id.*; video 1:19:00-1:19:10.) Durbin converses with the officer about

12

fingerprinting Ms. Jenkins, as she shakes and twitches on the ground, screams in

distress appearing to go in and out of consciousness. (*Id.*; video 1:19:00-1:19:35.)

While Durbin is standing over Ms. Jenkins, he asks her if she wants water, as

the other officer fingerprints her, to which she does not respond, nevertheless,

Durbin states, "Ok, sounds good, no water". (1-ER-130:7-16; video 1:19:55-

1:20:47.) While Durbin and the officer are standing over Ms. Jenkins as she lay on

the ground her body continues to twitch and shake displaying clear and objective

signs that she is overdosing and in need of a serious medical attention. (*Id.*)

Durbin and the officer take no action to address the serious medical needs of

Decedent as she lay on the ground overdosing. (*Id.*; video 1:19:55-1:22:05.)

After the results of the finger printing, Durbin and the other officer attempt to

lift her off the ground and place her in the back seat of the patrol car. (1-ER-130:7-

26; video 1:23:02-1:24:02.) Her body is listless, she continues to go in and out of

consciousness, her body twitches and shakes, and her breathing is at an abnormally

rapid rate. (*Id.*) Despite being able to walk on her own at the time of arrest, she

now can no longer stand, an objective sign that her condition has deteriorated, and

she needs serious medical attention. (*Id.*) Instead summoning medical care Durbin

begins to threaten her and stays "if you start resisting us there is an extra charge"

and yelling "Stand up...stop faking it", to which she helplessly mumbles "I am

13

not". (1-ER-130:7-26.) Durbin then lifts her entire body up and places her listless body face first on the back seat of his patrol car, as the other officer pulls her body from the other side of the vehicle. (*Id*.; video 1:23:02-1:24:02.) Durbin then closes the door and walks away, while Decedent is locked in the backseat face down and handcuffed, in need of medical attention. (1-ER-130:27-131:12.)

Durbin returns sometime later[2] and opens the back door and as she lay face down handcuffed and attempts to shake her with his hands as she is unresponsive. (1-ER-130:27-131:12; video 1:24:07-1:24:33.) Durbin then walks around to the other side of car to pull her body out of the car and lays her on the ground again. (*Id*; video 1:24:32-1:25:15.) He repeatedly says, "Ms. Jenkins wake up" as she is completely unresponsive, and attempts to take her pulse saying, "I can't tell if she is breathing or not". (*Id*; video 1:24:32-1:27:16.) While attempting to revive her, he states to the other officers that now arrived that she was responsive "seconds ago", which is untrue, as by Defendants own statement in their motion Durbin had last left her in the vehicle *eleven minutes and thirty seconds*. (*Id*. Video 1:26:19-1:26:30.) As the attempts to revive her continue, Durbin is asked if it was a narcotics arrest—as it was obvious she as overdosing—and he states "yes...she

---

[2] Appellants admitted in their Motion to Dismiss that Durbin left Ms. Jenkins in the patrol car back seat for eleven minutes and thirty seconds. (1-ER-158:14-15).

was surrounded by narcotics…she has a warrant for narcotics…but she is not a 11-5…she may have ingested something." (*Id.* Video 1:26:30-1:27:12.) After repeatedly attempting to unsuccessfully wake Ms. Jenkins to no avail, paramedics were finally summoned. (*Id.*) Ms. Jenkins proceeded to go into a coma and died on December 6, 2018. (1-ER-131:13-27.) Durbin first encountered Ms. Jenkins at approximately 3:52 and at approximately 6:14, for the nearly two and half hours (2.5 hours) that Durbin was interacting with her, he continually and repeatedly ignored objective signs that she was in serious need of medical attention. (*Id.*)

**POST and San Diego Police Department Policies**

SDPD Policy Manual, Section 6.12, states in part, "[o]fficers transporting persons in need of emergency medical treatment *shall* take them to the nearest primary emergency facility." (1-ER-127:15-21) Durbin and Taub are trained in accordance with Peace Officers Standards and Training ("POST") and SDPD policies to take immediate action to summon medical care if the arrestee's physical and/or mental reactions change, especially if the arrestee becomes disoriented and/or shows other signs of distress. (1-ER-123:3-20.) SDPD officers are trained that from the point of initial arrest, the arresting officers are responsible for the care and custody of an arrested person. (*Id.*) Defendants are trained in to identify and address arrestees who may be overdosing and withdrawing from drugs and

15

know that such conditions require urgent medical care to be summoned for the arrestee. (*Id*.) Reasonable police officers in similar circumstances to Durbin known from their training that an arrestee can be poisoned by ingesting or taking simulants such as methamphetamine. (1-ER-127:22-123:7.) Police officers are trained to err on the side of caution and summon emergency medical care to ensure the safety of the arrestee, even if medical help is offered but refused, and even if the arrestee does not ask for medical help. (*Id.*)

## District Court Proceedings

On November 5, 2019, Appellant filed the initial complaint in the District Court. (1-ER-1.) On December 13, 2019, Appellees' filed their first Motion to Dismiss. (1-ER-21:23-48-7.) Appellees requested that all of Appellant's causes of action, including those based on state law, be dismissed. (1-ER-48:4-5.) On January 3, 2020, Appellant filed their Opposition to Defendants' Motion to Dismiss. (1-ER-49:18-23.)

On January 13, 2020, the Honorable Cathy Ann Bencivengo ("Hon. Bencivengo") held a hearing regarding Defendants' Motion. (1-ER-86:1-95:25.) The Hon. Bencivengo immediately started the hearing by stating:

> We're here on the defendants' motion to dismiss. The reason I called
> you in is because the Court is going to grant the motion. I am going to

16

grant it with leave to amend, but I wanted to discuss a number of aspects of the pleadings that I think it's important that we have some clarity on before the plaintiff decides to proceed.

- (1-ER-88:7-12.)

Hon. Bencivengo then admonished Appellant's counsel stating "[t]here are a lot of conclusory allegations in the complaint, but there's not a lot of support for them." (1-ER-89:19-22.) Hon. Bencivengo then stated to Defense counsel:

You did not raise issues of qualified immunity. I know you challenged the first half of that, and you're certainly welcome to do that. But given that qualified immunity is an issue that should be addressed early in the litigation, not downstream, if you think that is an issue when the amended complaint is raised, then I would expect to see that raised at that time.

- (1-ER-92:11-17.)

Appellees' had not raised qualified immunity in their Motion. The same day, Hon. Bencivengo issued "Order Granting Motion to Dismiss" ("Order 1"). (1-ER-96.)

On March 12, 2020, Appellant filed his FAC adding a significant number of additional facts, addressing the issues raised by the District Court's order, and by incorporating by reference into the FAC the publicly available body cam footage of the interaction between Ms. Jenkins and Appellees. (1-ER-114-143.) Appellant did not pursue state law claims based on the District Court's order to not exercise supplemental jurisdiction, and no longer named Officer Casciola as a Defendant,

17

and did not pursue a Detention and Arrest Claim under 42 U.S.C. § 1983.  All in all, the FAC, provided a play-by-by regarding Durbin's inaction, and Ms. Jenkins slow and agonizing death, while in Officer Durbin's custody.  (1-ER-118-133.)

Additionally, Per the Court's clear guidance and order to not exercise supplemental jurisdiction of state law claims, Appellant only brought three causes of action in his FAC, all based on 42 U.S.C. §1983; 1) Denial of Medical Care; 2) Municipal Liability; and 3) Deprivation of Life Without Due Process.

On April 2, 2020, Defendants' brought their Second Motion to Dismiss All Causes of Action. (1-ER-144:1-188.)  In addition to recycling their prior arguments, Defendants now also argued that the Defendant officers were entitled to qualified immunity as suggested by Hon. Bencivengo at the prior hearing. (1-ER-174:17-176:28.) On April 23, 2020, Plaintiff filed his Opposition to Defendants' Motion to Dismiss. (1-ER-189-231.) The District did not hold a hearing on the Second Motion to Dismiss, and on May 18, 2020, Hon. Bencivengo issued an Order Granting the Motion to Dismiss, ruling that the entire FAC is dismissed with prejudice. (1-ER-242-256). Of note in Hon. Bencivengo's Order granting Appellees' Motion to Dismiss was her use and interpretation of the body cam footage which was incorporated by reference into the FAC. In the Order, Hon. Bencivengo acknowledged to watching the body cam footage "in its entirety". (1-

18

ER-243:24-244:3.) However, by incorporating the body cam footage into the FAC the District Court incorrectly held that the video "renders any written allegation describing what occurred on November 27, 2019 "somewhat superfluous". (*Id*.) Appellants decision to incorporate the footage by reference for demonstrative purposes was not done with aim of replacing or superseding the entirety of the allegations in the FAC, which the District Court improperly did in rendering its decision. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007) ([t]he inquiry is whether all the facts alleged, taken collectively… not whether any individual allegation, scrutinized in isolation, meets that standard.). After the District Court's May 18, 2020 Order and Judgment being entered, this appeal followed.

## STANDARD OF REVIEW

The district court's decision to grant Appellees' motion to dismiss for failure to state a claim upon which relief can be granted under *Federal Rules of Civil Procedure* section 12(b)(6) is reviewed *de novo*. *Wilson v. Lynch* (9th Cir. 2016) 835 F.3d 1083, 1090; *Dougherty v. City of Covina* (9th Cir. 2011) 654 F.3d 892, 897; *Knievel v. ESPN* (9th Cir. 2005) 393 F.3d 1068, 1072. The appellate court shall review the court's decision from the same position as the district court. *Lawrence v. Dep't of Interior* (9th Cir. 2008) 525 F.3d 916, 920; *Lewis v. United*

*States* (9th Cir. 2011) 641 F.3d 1174, 1176. Specifically, an appellate court must conduct an independent examination of the entire record, and review of the district court's prior order is plenary, meaning that this Court must "review the matter anew, the same as if it had not been heard before, and as if no decision previously had been rendered." *Freeman v. DirecTV, Inc.* (9th Cir. 2006) 457 F.3d 1001, 1004; *Agyeman v. INS* (9th Cir. 2002) 296 F.3d 871, 876; *Stilwell v. Smith & Nephew, Inc.* (9th Cir. 2007) 482 F.3d 1187, 1193.

During this Court's review of the district court's order granting Appellees' Motion, the facts alleged in the complaint are to be taken as true and must "plausibly give rise to an entitlement to relief." *Dougherty v. City of Covina* (9th Cir. 2011) 654 F.3d 892, 897. This Court is required to accept, "all factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party," here Plaintiff-Appellant. *Knievel*, 393 F.3d at 1072.

## SUMMARY OF THE ARGUMENT

The district court's decision to dismiss Appellant's FAC—without leave to amend—must be reversed as it is flies in the face of the plausible facts and allegations set forth in the FAC. The FAC sets forth substantial plausible and well

supported facts and allegations demonstrating deliberate indifference by Durbin and Taub toward Ms. Jenkins' serious medical needs, as she overdosed in their custody for nearly two and half hours. This Court has on numerous times stated that deliberate indifference claims are interpreted solely from an objective perspective and has no subjective component. *Castro v. County of Los Angeles*, 833 F.3d 1060, 1069–70 (9th Cir. 2016) (en banc). The same hold true with regards to the district court's qualified immunity holding, as Appellant maintains that there was a clear violation of Ms. Jenkins' constitutional rights and those rights were clearly established at the time of her death. Furthermore, based on that fact that Ms. Jenkins overdosed, and her serious medical need arose at the time of her arrest and while being transported to the headquarters—prior to her being booked or charged with a crime—Appellants maintain that the claim for medical attention could be analyzed pursuant to the Fourth Amendment reasonableness standard. Similarly, Appellant's FAC puts forth a plausible *Monell* claim based on failure to train and supervise, which the district court disregarded in its decision to dismiss the claim. Likewise, Appellant is entitled the relief and damages as pled in the FAC and has standing to pursue the claims as Ms. Jenkins' son and successor in interest. Lastly, the District Court erred when it held that because Appellant incorporated by reference Durbin's publicly available body cam footage into the

21

FAC that rendered the allegations in the FAC as "superfluous" and in essence replacing all the allegations in the FAC. Such a decision has no basis in the law, lacks merit and must be reversed.

## ARGUMENT

### A. The District Court Erred by Finding that the First Amended Complaint Did Not State a Plausible Claim for Denial of Medical Care Against Taub and Durbin

The district court failed to view Appellants FAC in the light most favorable to Appellant and to accept all material allegations and reasonable inferences therefrom in favor on Appellant. In fact, the only reasonable explanation for the district court's decision to dismiss the FAC—without leave to amend—is that the court viewed the evidence in the light most favorable to Appellees, which is inappropriate. Indeed, despite Appellant adding significant number of facts to the FAC, including incorporating the body cam footage, the district court in its order dismissing the FAC repeatedly referenced the original complaint, which is wholly in appropriate considering the FAC which was filed.

The district court dismissed the FAC by finding that Durbin and Taub were not deliberately indifferent to Ms. Jenkin's serious medical needs while she was in their custody. (1-ER-250:11:14; 251:28-252:2.) Drawing all reasonable inferences in favor of Appellant, however, the FAC alleges sufficient facts to state a plausible

22

claim for denial of medical care against Durbin and Taub. Therefore, the district court's decision should be reversed.

### 1. Officer Durbin Acted with Deliberate Indifference Toward Ms. Jenkins

Under the Fourteenth Amendment, claims for denial of medical care are evaluated under an objective deliberate indifference standard. The elements of a claim against an individual defendant are: "(i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries." *Gordon*, 888 F.3d at 1125 (adopting an objective reasonableness standard with respect to the third prong, considering developments in Section 1983 jurisprudence under *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015) and *Castro*, 833 F.3d 1060 (9th Cir. 2016). A "mere lack of due care by a state official" is insufficient—a plaintiff must "prove more than negligence but less than subjective intent— something akin to *reckless disregard*." *Id.* (emphasis added). A medical need is serious "if the failure to treat the [detainee's] condition could result in further

23

significant injury or the unnecessary and wanton infliction of pain." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). It has long been settled that deliberate indifference is shown where an official "purposefully ignore[s] or fail[s] to respond to a prisoner's pain or *possible* medical need." *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992) (reversed on other grounds) (emphasis added). Lastly, this Court has clarified that, in the context of pretrial detainees protected by the Fourteenth Amendment, deliberate indifference is interpreted solely from an objective perspective, and has no subjective component. *Castro*, 833 F.3d at 1069–70.

Based on this Court's holding in *Castro*, Appellants need not show that Durbin or Taub knew Ms. Jenkins had swallowed or ingested excessive amounts of drugs to prevail on their deliberate indifference claim. *Castro*, 833 F. 3d at 1070-71("[A] pretrial detainee need not prove those subjective elements about the officer's actual awareness of the level of risk."). This is even more true at the pleading stage. Rather, Appellant need only show that Durbin and Taub failed to take reasonable available measures to ameliorate the risk "even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved. *Id*. Furthermore, the district court ignored almost entirely the fact that Durbin and Taub called the paramedics at the scene of the arrest only to cancel

the call. (1-ER-248:27-250:16.) Tellingly, the district court focuses on the statement of "yes, please" by Ms. Jenkins and the fact that she did not affirmatively state she ingested drugs, while ignoring the overwhelming evidence of serious medical need when Ms. Jenkins repeatedly said she was "sick" and pled for "help" repeatedly during the drive and at the headquarters, her body twitching and her unresponsiveness. Such an argument is a red herring, as most people in police custody do not admit to crimes that may have taken place. The district court further ignored the ample evidence of a serious medical need, when stating "until the moment when Jenkins stopped breathing, it was not apparent that Ms. Jenkins was overdosing on drugs or that she was in need of emergency medical care." (1-ER-251:18-20). It would be an improper standard for an officer to wait until someone to completely stop breathing and slip into a coma to summon or render medical aid, at that point it would be too late, and such a standard would be contrary to settled law.

In the two-hours and twenty-two minutes (2:22) Ms. Jenkins was in Durbin's custody, from the time of the arrest through the moment she completely stopped breathing and fell into a coma, all objective facts point to one conclusion—Decedent was overdosing, a serious medical need, and Durbin exhibited a high degree of deliberate indifference toward her serious medical

25

needs. First, Appellant's FAC puts forth sufficient plausible facts demonstrating that under the totality of the circumstances known to Durbin at the time—the other occupants' narcotics convictions, the large amount of money found in the car, the saran wrap-like plastic, and Ms. Jenkins own drug warrant—and based on his training and expertise he had a strong understanding that drugs were involved. Indeed, based on his questioning at the scene of Ms. Jenkins about "withdrawing" after observing her vomiting, which led to the paramedics to be called, only to be deliberately and recklessly cancelled by him further demonstrates the undeniable fact that Durbin had a strong understanding that drugs were involved. Moreover, Durbin's' admission after she stopped breathing that "yes…she was surrounded by narcotics…she has a warrant for narcotics" demonstrates he had knowledge that Ms. Jenkins may have ingested drugs, as a reasonable officer under the similar circumstances would have. These allegations support the plausible inference that Durbin knew that Mr. Jenkins was overdosing and needed immediate medical attention.

Second, the FAC and the body cam footage reveal further sufficient and plausible facts that for the entirety of the over one-hour drive from the scene of the arrest to the police headquarters Ms. Jenkins pled for help, exhibited an abnormally rapid rate of breathing, including screaming very loudly and pleading, "*please help*

*me, please help me*", "*I'm sick*", and "*help me…I'm telling you I can't*". (1-ER 126:6-8; 128:8-16; video at 1:04-1:06.) (emphasis added). At one point after hearing no response from Ms. Jenkins for ten (10) minutes Durbin to pulls his car over, walks to the back and opens the back door causing Ms. Jenkins' listless body to fall half-way out of the door. (1-ER-126:18-127:14; video at 1:14:26-1:14:38.) At this moment, Ms. Jenkins displays objective signs medical distress when Durbin opens the door, including, but not limited to panting, abnormally rapid rate of breathing, listless body, and unresponsiveness for approximately ten (10) minutes. *Id.* Durbin then says to her "I need you to stay awake" and he places his hand on her to push her back into the car—a clear indication that Durbin has an understanding that she is in distress by asking her to stay awake—and as he is pushing her back into the car Ms. Jenkins pleads with him "I'm sick" as Durbin slams the door shut on Decedent. *Id.*

Third, the same holds true for the alleged facts and undisputed evidence of the body cam while at the Headquarters, which further demonstrate the plausible inference that Durbin knew that Ms. Jenkins needed immediate medical attention and failed to summon such care. Upon arriving at the headquarters, Durbin opened the back door, to find Ms. Jenkins lying face down in the back seat handcuffed, screaming, and panting loudly and rapidly, and was experiencing significant

medical distress by breathing at an obvious abnormally rapid rate, which is a clear and objective sign that she needs serious medical attention and may be overdosing. (1-ER 129:3-23; video 1:17:18-1:17:55.) Durbin then pulls her listless body out of the back seat and lays her on the ground in the headquarters parking lot preparing to fingerprint her, as she pleads with him to "*help me*". (1-ER 129:24-130:6; video 1:19:00-1:19:10.) As Ms. Jenkins' lays on the ground, he body shakes, twitches, and she continues to breath in an abnormally rapid manner. *Id.* After the fingerprinting is done, Durbin and another officer lift her listless body and place her in the back of the patrol car, face down, handcuffed and windows up for *eleven minutes and thirty seconds.* (1-ER-130:27-131:12; video 1:23:02-1:24:11). The act of placing her listless body after her pleas for help in the back of patrol car, face down, handcuffed, helpless and the windows up, is a clearly demonstrate the plausible inference that Durbin was deliberately indifferent to her medical needs by failing to summon medical attention.

Appellants admitted in their motion to dismiss the FAC that Durbin had left Ms. Jenkins in the back of the patrol car for *eleven minutes and thirty seconds.* (1-ER-158:14-15). Upon returning and realizing that Ms. Jenkins' is no longer breathing, Durbin pulls her out of the car and attempts to revive her, and at that time Durbin is asked by another officer if it was a narcotics arrest—as it was

28

obvious she as overdosing—and he states "*yes…she was surrounded by narcotics…she has a warrant for narcotics…but she is not a 11-5…she may have ingested something*." (1-ER-119 footnote 1; video 1:26:30-1:27:12.) After repeatedly attempting to wake Ms. Jenkins up to no avail, paramedics were finally summoned, after Ms. Jenkins had stopped breathing and lost complete consciousness. (1-ER-131:3-12.)

The district court's dismissal is inappropriate at this stage as the FAC and the body cam footage demonstrate a plausible set of facts that Ms. Jenkins was overdosing, which is a serious medical need, for which she needed to get prompt medical attention to not result in further significant injury. *Jett*, 439 F.3d at 1096. There is no other way to interpret the numerous and multiple times she said, "I'm sick", her multiple pleas and screams of "Help me!", "please help me, please help me", "oh my god, please stop, stop, stop", and "help me…. I'm telling you I can't", but demonstrating a person screaming for help and medical assistance. This coupled with Durbin's decision to cancel paramedics at the scene of the arrest, Ms. Jenkins' obvious sign of physical distress when she could stand up at the initiation of the traffic stop but could not stand or sit and lay on the ground face first in and out of consciousness when arriving at the station; her loud panting, obvious abnormal breathing rate, body twitching and shaking while she lay face down in

29

the back seat of the patrol car and on the ground at the station; the decision to leave her handcuffed and face down in the patrol car for *eleven minutes and thirty seconds* after all the above obvious signs of a serious medical need—all demonstrate that Durbin acted deliberately indifferent to Ms. Jenkins' serious medical needs. This is not a situation of 20/20 hindsight, but rather a situation where for over two hours, Ms. Jenkins overdosed before Durbin's eyes as is clear in the body cam, while pleading for help and telling him she was sick, among numerous other objective signs, only to be ignored until she slipped into a coma and died days later.

The district court chose to ignore the sufficient evidence at this stage, that a reasonable officer in Durbin's position would have noticed that Ms. Jenkins was overdosing. Indeed, the district court stated that "the circumstances that led to Ms. Jenkins being detained did not arise from a drug arrest, no drugs were found at the traffic stop, and she did not appear to be under the influence of drugs and affirmatively state she had not ingested any drugs and was not detoxing." (1-ER-251:13-17.) Such a statement flies in the face of the overwhelming evidence and facts set forth in the FAC and the bodycam footage, Durbin's' own words and questioning at the scene of the arrest, his decision to call paramedics and then cancel, Ms. Jenkins pleas for help and his statements once Ms. Jenkins stopped

30

breathing. The fact that Ms. Jenkins did not affirmatively state she had ingested drugs is a red herring argument as it is common knowledge to police officers that individuals do not admit to crimes and ignores the abundance of evidence supporting the signs of serious medical need she exhibited. The district court was not free to draw an inference in favor of Appellees. Ms. Jenkins statements or non-statements do not abdicate Durbin's of their constitutional obligations, training, and the policies of the San Diego Police Department ("SDPD") to provide medical care to a detainee who is overdosing. Contrary to the district court's assertions, *Twombly* reaffirmed the rule that all reasonable inferences must be drawn in favor of the non-moving parting, here Appellants. See *Twombly*, 550 U.S. at 555.

**2. Officer Taub Acted with Deliberate Indifference Toward Ms. Jenkins**

Like Durbin, the district court erroneously dismissed the allegations of denial of medical care against Taub despite ample facts demonstrating a plausible claim for relief.  Based on the objective symptoms and signs at the time and under the totality of information known to Taub he acted deliberately indifferent to Decedent's serious medical needs. Like Durbin, it is undisputed that at the scene of the arrest Taub was aware that the male occupants of the Cadillac had prior arrests and/or convictions for narcotics sales, Ms. Jenkins' warrant, a saran wrap-like plastic (common use for narcotics sales), and a wallet with a lot of cash. (1-ER-

31

120:1-19; video at 0:00-7:45). Soon thereafter, Taub observed her vomit on herself while in the back of Durbin's patrol vehicle, and when asked why stated, "I'm sick" twice. (1-ER-121:12-20; video at 11:54-12:20.) Taub then asked if she was "detoxing" to which Decedent responds, "No, I'm sick my stomach is turning.", and then stated she was pregnant[3]. *Id*. He then also asks "did you eat something? And Mr. Jenkins conflictingly responds "mm-mm" while nodding her head. (1-ER-119 footnote video 12:05-12:49.) At 11:41 of the video footage from Durbin's body cam it indicates "Officer prepares to request medics respond". (1-ER-121:21-22). However, despite her continuing to vomit, dry heave, visibly be disoriented, exhibiting clear signs of distress by hunching over while handcuffed, deterioration of her condition from moments prior when she was walking and standing, having glossy eyes, trouble speaking, and incoherent statements, Durbin yells to Taub, who had already placed the call to paramedics, "don't worry about it", to get Taub to cancel the paramedics, which Taub immediately did. (1-ER-121:23-122:12).

Faced with the undeniable facts at the scene, Taub, who asked her if she was "detoxing", deliberately and recklessly decided to cancel the call to paramedics.

---

[3] While it is true that Ms. Jenkins told Taub and Durbin she was pregnant once, that does not abdicate him of their constitutional duty and does not outweigh the objective signs that she was vomiting, along with the totality of the other information know to Taub at the time.

32

Reasonable officers, in the position of officers like Taub, based on their POST training and SDPD policies and training know that it is their duty to ensure the safety of ill or injured persons, to evaluate emergency situations, and to take necessary actions for the well-being of the ill or injured person. (1-ER-122:36-124:9). These allegations in the FAC, looked at from the perspective of a reasonable officer at the scene, present a plausible set of facts when taken in the light most favorable to Appellant that Taub was deliberately indifferent to Ms. Jenkins' serious medical needs.

## B. The District Court Erred in Finding that Durbin and Taub are Entitled to Qualified Immunity

Dismissing the FAC based on qualified immunity is likewise inappropriate on Appellant's § 1983 denial of medical care claim, as the FAC makes clear there was a constitutional violation of Ms. Jenkins' clearly established rights. Appellants should not have been granted qualified immunity to be shielded from their culpable actions that led to the untimely death of Ms. Jenkins. Here, a reasonable officer in Durbin and Taub's position would have known that Ms. Jenkins was overdosing— a serious medical need—and would have summoned immediate medical care for her. The district court erred in its qualified immunity finding that because it found no constitutional violation by Durbin or Taub of Ms. Jenkins rights they were

33

entitled to qualified immunity. The district court then went on to hold, assuming there was a constitutional violation, Durbin and Taub would be entitled to qualified immunity because rights in question were not clearly established at the time.

In determining whether qualified immunity is proper this Court considers: (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *C.V. by & through Villegas v. City of Anaheim*, 823 F.3d 1252, 1255 (9th Cir. 2016) (quoting *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014)). Furthermore, "[t]he doctrine of qualified immunity protects government officials' from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Jessop v. City of Fresno*, 936 F.3d 937, 940 (9th Cir. 2019) (internal quotation marks omitted). The dispositive inquiry in determining whether a right is clearly established "is whether the state of the law [at the time of the official conduct complained of] gave [defendants] fair warning that their alleged [conduct] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741(2002). In *Ashcroft v. al-Kidd*, the Supreme Court explicitly held that "[w]e do not require a

34

case directly on point." 563 U.S. 731, 741 (2011).[4] Similarly, in *Hope v. Pelzer,* The Supreme Court has made "clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances." 536 U.S. 730, 741 (2002). Lastly, in considering existing precedent, the Court "may look at unpublished decisions and the law of other circuits, in addition to Ninth Circuit precedent." *Prison Legal News v. Lehman*, 397 F.3d 692, 702 (9th Cir. 2005).

Under Appellant's facts in the FAC, as set for above and incorporated by refence here, Durbin and Taub violated Ms. Jenkins right to medical care when faced with her serious medical need of overdosing while in custody. The district court incorrectly reasoned that "a reasonable officer could have believed that Ms. Jenkins was not overdosing and did not have a serious medical need warranting immediate medical care." (1-ER-253:24-27). This Court has held that when analyzing qualified immunity an officer's subjective beliefs are "irrelevant". *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir. 2007). Here, under the totality of the

---

[4] *See also Deorle v. Rutherford,* 272 F.3d 1272, 1285-1286 (9th Cir. 2001) ("Although there is no prior case prohibiting the use of this specific type of force in precisely the circumstances here involved, that is insufficient to entitle [the defendant] to qualified immunity: notwithstanding the absence of direct precedent, the law may be, as it was here, clearly established. Otherwise, officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct.") (internal citation omitted).

35

circumstances present there is no other way to interpret the numerous and multiple times she pled, "I'm sick", her multiple pleas and screams of "Help me!", "please help me, please help me", "oh my god, please stop, stop, stop", and "help me…. I'm telling you I can't", but a person screaming for help and medical assistance. This coupled with Durbin and Taub's decision to cancel paramedics at the scene of the arrest, Ms. Jenkins' obvious sign of physical distress when she could stand up at the initiation of the traffic stop but could not stand or sit and lay on the ground face first in and out of consciousness when arriving at the station; her loud panting, obvious abnormal breathing rate, body twitching and shaking while she lay face down in the back seat of the patrol car and on the ground at the station; the decision to leave her handcuffed and face down in the patrol car for *eleven minutes and thirty seconds* after all the above obvious signs of a serious medical need—all demonstrate deliberate indifference toward Ms. Jenkins' serious medical needs. The facts set forth in Appellant's FAC are more than sufficient to make a plausible claim for denial of medical care.

Moving to the next step of the qualified immunity analysis, under Appellant's set of facts, a reasonable officer in Durbin and Taub's position would have been on fair notice that his conduct violated "clearly established" law. In other words, viewing the evidence in the light most favorable to Appellants, the

36

relevant law was far from murky in May 2019 that Durbin and Taub are entitled to qualified immunity for violation Ms. Jenkins' rights. As this Court made clear over two decades ago, it was well established that a police officer may be held liable if he acted with deliberate indifference under the Fourteenth Amendment to an individual's substantial risk of harm. *Frost v. Agnos,* 152 F.3d 1124, 1128 (9th Cir. 1998). This Court has stated that "persons in custody ha[ve] the established right to not have officials remain deliberately indifferent to their serious medical needs." *Gibson v. Cty. of Washoe, Nev*., 290 F.3d 1175, 1187 (9th Cir. 2002) (reversed on other grounds). It has long been settled that deliberate indifference is shown where an official "purposefully ignore[s] or fail[s] to respond to a prisoner's pain or *possible* medical need." *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992) (reversed on other grounds) (emphasis added). Similarly, federal district courts within this circuit and throughout the country have found deliberate indifference claims cognizable when law enforcement officers have failed to adequately respond to known or suspected drug overdoses. *Estate of Levingston v. County of Kern*, 2018 WL 1335410, at *6 (E.D. Cal. March 15, 2018)[5].

---

[5] *Estate of Lawson ex rel. Fink v. City of Hamilton*, 2009 WL 1444556, at *17 (S.D. Ohio May 21, 2009) (denying qualified immunity where officer was aware decedent was under the influence of some unknown drug, decedent fell asleep in a "contorted and bizarre position," and did not change her position for a substantial period of time); *Hall v. County of Nemaha*, 509 F. Supp. 2d 821, 832 (D. Neb. 2007)

37

Here, the FAC, including the bodycam, set for significant and plausible facts demonstrating that Ms. Jenkins faced a serious medical need while in custody. Moreover, based on their training, POST and the SDPD Policy Manual, Section 6.12, which states that "[o]fficers transporting persons in need of emergency medical treatment shall take them to the nearest primary emergency facility", thus Durbin and Taub were on fair notice to provide medical care to individuals such as Ms. Jenkins who displayed objective signs of a serious medical need. (1-ER-127:22-128:7). This case is unlike in *Estate of Levingston*, where the Court found qualified immunity after summary judgment applied because the officer in that case, suspecting an overdose, summoned a paramedic and firemen for medical evaluation, and neither the paramedic nor fireman recommended further medical intervention. *Estate of Levingston,* 2018 WL 1335410, at *10. Here, Durbin and Taub did no such thing and indeed cancelled the call to paramedics and ignored the more than sufficient objective signs that Ms. Jenkins' was overdosing. The FAC set forth plausible facts demonstrating that Ms. Jenkins faced a serious medical

---

(denying summary judgment to defendants who were told decedent was overdosing, who saw him "panting and gasping," and who heard him say he needed to go to the hospital); *Pryor v. Dearborn Police Dep't*, 452 F. Supp. 2d 714, 719–21 (E.D. Mich. 2006) (denying summary judgment where officers were aware of symptoms of a drug overdose and yet failed to summon medical assistance).

need when she was overdosing while in custody for over two hours, and that Durbin and Taub knew of such a risk and disregarded it. Therefore, viewing the facts in the light most favorable to Appellee, qualified immunity should not have been granted in favor of Durbin and Taub on the denial of medical car claim.

## C. The District Court Erred in Not Analyzing the Denial of Medical Care Claim Under the Fourth Amendment

Appellant maintains that there is ample precedent for the district court to have analyzed the denial of medical care claim pursuant to the Fourth Amendment reasonableness standard. Indeed, this Court has stated that claims regarding deficient medical care during and immediately following an arrest under the Fourth Amendment pursuant to *Tatum v. City and Cnty. of S.F.,* 441 F.3d 1090, 1098–99 (9th Cir. 2006) and its progeny. Appellant posits that the facts of this case warrant analysis under the Fourth Amendment because the cases relied upon by the Court in its order dismissing the FAC all involved detainees who had gone through the jail intake process and were housed in a jail cell when their serious medical needs arose. (1-ER-247:4-248:5). Here, by contrast, Ms. Jenkins was arrested and suffered from a serious medical need at the scene of the arrest and en route to the police headquarters and ultimately, slipped into a coma and died, never to set foot in a jail cell. For example, in *Gordon v. County of Orange*, 888 F.3d 1118, 1121

39

(9th Cir. 2018), decedent died *thirty hours* after being detained in jail for drug charges and after going through the jail's intake and being housed in different cells. (emphasis added). The same holds true for *Castro*, 833 F.3d at 1064, where Plaintiff was arrested and placed in a sobering cell within the police station, and hours later was violently assaulted by a combative cell mate, dying as a result.

Though there is no bright line rule indicating where the 'objectively reasonable' standard ceases to apply (i.e., as soon as the arrestee enters the police station, or when the arrestee undergoes intake or medical screening in the police station, or even up to a probable cause hearing), the 'objective reasonableness' standard "governs events that occur in the course of an arrest or other seizure, up until the point of pre-trial detention." *Henriquez v. City of Bell*, 2015 WL 13357606 at *6 (C.D. Cal. 2015) (the court applied the Fourth Amendment's 'objectively reasonable' standard to assess the police officers' conduct in a denial of medical care claim when the arrestee had already been booked, a property record had been obtained, and he was placed in a sobering cell for monitoring, but he had not yet been arraigned) *citing Graham v. Connor*, 490 U.S. 386, 395 (1989); *Fontana v. Haskin*, 262 F.3d 871, 879 & n.4 (9th Cir. 2001); *Robins v. Harum*, 773 F.2d 1004, 1009 (9th Cir. 1985). The application of the 'objectively reasonable' standard to police conduct during and post-arrest is reinforced by the

Ninth Circuit's longstanding and steadfast application of the "continuing seizure" doctrine to searches and seizures. "Once a seizure has occurred, it continues throughout the time the arrestee is in the custody of the arresting officers." *Torres*, 524 F.3d at 1056 (9th Cir. 2008) "Once pre-trial detention starts, the Fourteenth Amendment's due process standard applies." *Gibson*, 290 F.3d at 1187; *Frost*, 152 F.3d at 1128.

Here, by contrast Ms. Jenkins' stopped breathing and fell into a coma in the back seat of Durbin's patrol car before she could undergo any intake, medical screening or be housed in a jail cell. In fact, in contrast to *Gordon* and *Castro*, Ms. Jenkins in this case began exhibiting clear signs of a serious medical need shortly after the initiation of the pull over and handcuffing, when she vomited in the back of Durbin's patrol before leaving the scene, as well as, when Taub initiated the call to paramedics which was deliberately and recklessly called off by Durbin at the scene of the arrest. These facts, and the remainder of the facts set for in Appellant's FAC militate toward a Fourth Amendment analysis. (1-ER-118:24-131:27). All of these facts make the casa more akin to *Tatum*, in which the Ninth Circuit held that the Fourth Amendment requires the arresting officer to "promptly summon [ ] the necessary medical assistance"—whether that is *promptly* bringing the arrestee to the hospital or *promptly* summoning some other type of care. *Tatum*, 441 F.3d at

1099 (emphasis added); *Ostling v. City of Bainbridge Island*, 872 F. Supp. 2d
1117, 1129 (W.D. Wash. 2012).[6] The above facts demonstrate that Durbin and
Taub failed to provide objectively reasonable post-arrest care to Ms. Jenkins. A
reasonably trained officer would have known that the conditions displayed by Ms.
Jenkins required immediate medical attention, as evidenced by the initial call to
paramedics that was cancelled.

## D. The District Court Erred in Dismissing Appellant's Deprivation of Life Without Due Process Claim

Appellant maintains that the third cause of action in the FAC for Deprivation
of Life Without Due Process is governed by the same deliberate indifference
standard under the Fourteenth Amendment. (1-ER-140:15-142:6.) As such,
Plaintiff incorporates by refence the arguments set forth above in Section A, 1 and
2. Appellant's FAC set for a plausible and well-pled cause of action for
Deprivation of Life Without Due Process pursuant to 42 U.S.C. § 1983 and the
district court's decision to dismiss this claim must be reversed.

---

[6] *See also Mejia v. City of San Bernardino,* 2012 WL 1079341 (C.D.Cal. Mar. 30,
2012); *Fonseca v. City of Fresno,* 2012 U.S. Dist. LEXIS 2327, 23–25 (E.D.Cal.
Jan. 9, 2012); *Von Haar v. City of Mt. View,* 2011 WL 782242 (N.D.Cal. Mar. 1,
2011); *see also City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

**E. The District Court Erred in Dismissing Appellant's *Monell* Municipal Liability Claim**

The district court's dismissal of Appellant's *Monell* claim against the City of San Diego was inappropriate and unfounded. To plead liability of governmental entities under *Monell,* a Appellant must establish: "(1) that the plaintiff possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation." *Mackie v. Cty. of Santa Cruz*, 444 F.Supp.3d 1094, 1112 (USDC N.D. Cal. 2020) *citing Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). As aforementioned in this brief, Appellant adequately alleged facts establishing the existence of a deprivation of a constitutional right through the Durbin and Taub's' failure to render medical aid when constitutionally required to do so.

Since *Monell,* the Ninth Circuit has expanded the premises upon which municipals can be held liable in section 1983 claims. It is well-established law in the Ninth Circuit that a municipality can be held liable as a "person" under 42 U.S.C. § 1983 if it caused a civil rights violation under any of the following three theories: (1) commission, (2) ratification, or (3) omission. *Clouthier v. Cnty. of*

43

*Contra Costa*, 591 F.3d 1232, 1249-1250 (9th Cir. 2010), *overruled on other grounds by Castro*, 833 F.3d 1060. Moreover, the Ninth Circuit has held that *Monell* liability can be premised on a single incident, including deliberately indifferent training and ratification. *Christie v. Iopa*, 176 F.3d 1231, 1234-1240 (9th Cir. 1999).

A local government may be held liable under section 1983 for "acts of "omission" when such omissions amount to the local government's own official policy. *Id.* at 1249; *See Mackie,* 444 F.Supp.3d at 1114 (courts recognize a 'failure to train' as sufficient to establish *Monell* liability) *citing Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1159 (9th Cir. 2012) ("a failure to train can be a 'policy' under *Monell*"). Additionally, like a municipality's 'failure to train,' municipal liability under a section 1983 claim is found due to the city's 'failure to supervise.' Said failure "can constitute a policy of inaction that amounts to deliberate indifference to a plaintiff's constitutional rights." *Estate of Mendez v. City of Ceres*, 390 F.Supp.3d 1189, 1207-1208 (E.D. Cal. 2019).

There are several ways in which a county may be liable for 'inadequate training.' The first is through a deficient training program "intending to apply over time to multiple employees," whereby the continued observance by policymakers "to an approach that they know or should know has failed to prevent tortious

conduct by employees may establish the conscious disregard for the consequences of their action-the 'deliberate indifference'-necessary to trigger municipal liability." *Board of County Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 407 (1997). Second, a local government may be liable if "the existence of a pattern of tortious conduct by inadequately trained employee" is the "moving force behind plaintiff's injury." *Id.* at 407-408. Third, a plaintiff may prove a claim for 'failure-to-train' without demonstrating a pattern of constitutional violations where "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Id.* at 409.

The district court failed to properly analyze Appellant's *Monell* allegations in the FAC, premised on the City's failure to train and/or supervise its police officers such as Taub and Durbin. The district court inappropriately limited its analysis to Plaintiff's reference to the City of San Diego's written policies that require police officers to seek medical care in circumstances such as those set for in the FAC. This is a complete misrepresentation of the FAC and a haphazard understanding of the law pertaining to *Monell* claims and should not be adopted by this Court. As afore described, established precedent succeeding *Monell* has determined that municipal liability under a section 1983 claim can be based on a

45

failure to train and/or supervise as said omission constitutes a municipal policy. The purpose of Plaintiff's inclusion of those written policies in the First Amended Complaint was to demonstrate that several officers failed to adhere to the written policies, and such failure demonstrates the City's need and failure to train the police officers properly according to the written policies.

The *Monell* claim in the FAC is pled sufficiently. There is extensive and diverse precedent guiding the law regarding pleading municipal liability under section 1983 (a *Monell* claim). In the seminal case of *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 113 S.Ct. 1160 (1993), the Supreme Court held that a federal court may not apply a "heightened pleading standard" – "more stringent than usual pleading requirements of Federal Rule of Civil Procedure 8(a) – in civil rights cases alleging municipal liability under § 1983." *Id.* at 1161. However, the Ninth Circuit has since adopted its own standard for federal courts to apply when reviewing the sufficiency of a complaint upon a motion to dismiss. In *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011), the appellate court addressed the standard of pleading a section 1983 against a municipality for supervisorial liability in an unconstitutional confinement case. The court reached the conclusion that the *Twombly/Iqbal* decisions applied a higher pleading standard than the standard applied in *Swierkiewic*, and "To the extent that we perceive a

46

difference in the application of Rule 8(a) in the two groups of cases, it is difficult to know in cases that come before us whether we should apply the more lenient or the more demanding standard." *Id.* at 1215. Accordingly, the Ninth Circuit reached the following conclusion: "[w]hatever the difference between these cases, we can at least state the following two principles common to all of them. First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Id.* at 1216.

The facts alleged in the FAC put forth a plausible claim against the City of San Diego for its failure to train and/or supervise its police officers. The FAC alleges that the involved officers completely failed to adhere to San Diego's written policies (Section 6.12 of the San Diego Police Department Policy Manual and Peace Officers Standards and Training ("POST")). As alleged in the FAC, such policies mandate that a police officer must render medical aid to an arrestee who becomes disoriented and/or shows other signs of distress and a police officer

47

who transports a person in need of emergency medical treatment "shall" take that person to the nearest primary emergency facility. (1-ER-138:22-139:18.) The FAC alleges that California sworn police officers, like Officers Taub and Durbin, are trained in accordance with these policies. (*Id.*) Nonetheless, the written allegations of the FAC, as well as the police officer's bodycam video footage, establish that the police officers witnessed Ms. Jenkins' need for medical care and all four officers failed to render medical aid as described herein.

The facts of Plaintiff's FAC evidence a pattern by the San Diego Police Department officers of ignoring an arrestee's medical needs and of refusing to render medical aid to an arrestee when aid is needed. The officers should have appreciated Ms. Jenkins' apparent need for medical help at several moments throughout the course of this detention: while she was throwing up at the scene of the arrest, while she was in the patrol vehicle en route to the police station, and while she was unconscious and twitching on the concrete floor in the police station.

///

///

48

**F. Appellant Has Standing and Can Assert and is Entitled to All Damages Pled and Set Forth in the FAC**

The district court erroneously held that Appellant failed to establish standing to bring this lawsuit as a survival action on behalf of the Ms. Jenkins. Specifically, that Appellant failed to adhere to *California Code of Civil Procedure* section 377.32 because the Ms. Jenkins had two other biological children, yet Appellant was the only successor in interest who brought the current lawsuit. (1-ER-244:11-247:2.) This is an improper holding.

The district court's position is baseless. "A cause of action that survives the death of a person [.] may be commenced by the decedent's personal representative, or, if non, by the decedent's successor in interest." *Cal. Code Civ. Proc.* §377.30. A "'decedent's successor in interest' means the beneficiary of the decedent's estate or other successor in interest who succeeds to a cause of action or to a particular item of the property that is the subject of a cause of action." *Cal. Code Civ. Proc.* §377.11. There is no requirement, or for that matter, any authority, establishing that all potential heirs must be joined in a section 1983 suit alleging failure to provide medical care. *See Raymond v. Martin*, 2018 WL 4560686 at *2 (E.D. Cal. 2018). Plaintiff, J.K.J., is a successor in interest to his mother's estate and has correctly asserted that information in the affidavit on file. (1-ER-228-231; 257-

49

259.)  Accordingly, the district court's finding must be reversed, and Appellant's standing found to be proper.

Furthermore, Appellant has prayed for damages that are recoverable individually and on behalf of the decedent's in section 1983 actions. California expressly authorizes survival actions. *See Cal. Code Civ. Proc.* §§377.30, 377.34 & 377.20. "Under California law, if an injury giving rise to liability occurs before a decedent's death, then the claim survives to the decedent's estate." *Tatum v. City and Cnty. of San Francisco supra*, 441 F.3d at 1094 n. 2. Here, Appellant has brought this civil rights action as a survivor to vindicate the losses sustained by Ms. Jenkins. Precedent establishes that Appellant, as successor in interest to Ms. Jenkins, has rightfully prayed for certain survival damages in section 1983 causes of action. For instance, claims under section 1983 warrant the recovery of medical expenses, funeral and burial expenses, and the loss of earnings from the time of injury to death to the decedent's estate. *Guyton v. Phillips*, 532 F.Supp. 1154,1167-1168 (N.D. Cal. 1981). Additionally, punitive damages are also awardable in a section 1983 claim in a survivor's action. *Id.* at 1168 *Carey v. Piphus*, 435 U.S. 247, 257 n. 11 (1978); *See S.T. by and through Niblett v. City of Ceres*, 327 F.Supp.3d 1261, 1285 (E.D. Cal. 2018) (Where "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous

50

indifference to the federally protected rights of others," punitive damages are awardable in a section 1983 action) *citing Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005). All of the aforementioned damages are sought in the Prayer for Relief in the FAC and are, consequently, awardable damages.

Similarly, the request for 'pain and suffering' in this survival action is duly merited. Though *Code of Civil Procedure* section 377.34, one of California's survival statutes, precludes recovery of the decedent's pain and suffering pre-death, California's federal courts have ruled that this part of the statute is not enforceable in section 1983 actions in federal court. *See Guyton*, 532 F.Supp. 1154 (N.D. Cal. 1981) *disapproved on other grounds by Peraza v. Delameter*, 722 F.2d 1455 (9th Cir. 1984); *Cotton ex rel. McClure v. City of Eureka, Cal.*, 860 F.Supp.2d 999 (N.D. Cal. 2012); *Chaudry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014) ("California's prohibition against pre-death pain and suffering damages limits recovery too severely to be consistent with §1983's deterrence policy. Section 377.34 therefore does not apply to § 1983 claims where the decedent's death was caused by the violation of federal law").

Lastly, Appellant is also seeking "loss of love" and "companionship" damages individually, which is augmented by the Due Process Clause of the Fourteenth Amendment. The Ninth Circuit recognizes that children, like parents,

possess the right to assert substantive due process claims under the Fourteenth Amendment because they have a constitutional interest in familial companionship. *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1957-1958 (9th Cir. 2018); *See also Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1229-1230 (9th Cir. 2013) ("This Circuit has recognized that a child has a constitutionally protected liberty interest under the Fourteenth Amendment in the "companionship and society" of her father") *referring to Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991). A child can pursue a section 1983 cause of action individually where there has been a deprivation of his or her right to familial companionship. Though Fourth Amendment and personal injury claims belong to the decedent and are brought on his or her behalf by the successors in interest, "[c]laims for damages arising out of the loss of Decedent's companionship and support belong to the survivors and are asserted by them on their own behalf" as a violation of a liberty interest deriving from the loss of familial association or companionship and support under the Due Process Clause of the Fourteenth Amendment. *Morales v. City of Delano*, 2012 WL 1669398 at *8 (E.D. Cal. May 11, 2012).

A child may, therefore, assert a Fourteenth Amendment substantive due process claim in a section 1983 action if the child is deprived of his liberty interest in the companionship and society of his parent. In *Ovando v. City of Los Angeles*,

92 F.Supp.2d 1011, 1018-1019 (C.D. Cal. 2000), the court held that plaintiff's minor daughter held a viable substantive due process claim under section 1983 for the deprivation of her constitutional right to familial association due to her father's wrongful incarceration. In order to assert a Fourteenth Amendment substantive due process claim, the plaintiff must assert that he or she was deprived of the companionship of the parent through official conduct that 'shocks the conscience.' *Campos v. Cty. of Kern*, 2017 WL 915294 at *8 (E.D. Cal. March 17, 2017) *referring to Lemire v. Cal. Dept. of Corrections and Rehabilitation supra,* 726 F.3d at 1075; *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998); *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008); *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). To determine whether an official conduct 'shocks the conscience,' courts look to the totality of the circumstances. *Campos v. Cty. Of Kern supra,* WL 915294 at *9.

Appellant individually and properly pled a Fourteenth Amendment substantive due process claim in the third cause of action. Appellant specifically averred in his FAC that he had a "cognizable interest under the Substantive Due Process Clause of the Fourteenth Amendment of the United States Constitution, to be free from state actions that deprive of life, liberty or property in such a manner as to chock the conscience, including but not limited to, unwarranted state

interference in Plaintiff's relationship with his mother." (1-ER-141:1-5.) The official conduct that 'shocked the conscious' was Durbin and Taub's failure to render medical care to Ms. Jenkins despite the objective signs of her serious medical need during the arrest, during the drive to the police station, and while at the headquarters police station, all of which was pled and incorporated in the third cause of action of the FAC. Appellant also averred that this conduct caused Appellant to have been "deprived of love, companionship, comfort, care, assistance, protection, affection, society, and moral support of Decedent, and will continue to be so deprived for the remainder of his natural life," obviously evidencing a permanent and not temporary deprivation. (1-ER-141:24-142:6.) Due to the foregoing, Appellant's request for these damages in his Prayer for Relief is proper.

## G. The District Court Erred When It Found that the Allegations in the FAC Were "Superfluous" In Light of the Durbin's Body Cam Footage Being Incorporated into the FAC

Appellant's FAC incorporated by reference the publicly available body came footage from Durbin which captured much, but not all, of the interaction with Mr. Jenkins on that faithful day. (1-ER-119:25-28, fn.1). In the Order dismissing the FAC, Hon. Bencivengo acknowledged to watching the body cam footage "in its entirety". (1-ER-243:24-244:3.) However, by incorporating the body cam footage

into the FAC the District Court incorrectly held that the video "renders any written allegation describing what occurred on November 27, 2019 "somewhat superfluous". (*Id*.) Appellants decision to incorporate the footage by reference for demonstrative purposes was not done with aim of replacing or superseding the entirety of the allegations in the FAC, which the District Court improperly did in rendering its decision. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007) ([t]he inquiry is whether all the facts alleged, taken collectively… not whether any individual allegation, scrutinized in isolation, meets that standard.). By doing so the district court improperly converted Appellees' 12(b)(6) motion into a Motion for Summary Judgment, when no discovery had taken place, and no opportunity for discovery was afforded to Appellant, which is improper and lacks merit under the law.

While Appellant does agree that the district court can consider documents and evidence incorporated by reference into a complaint, this Court recently stated that "what inferences a court may draw from an incorporated document should also be approached with caution." *Khoja v. Orexigen Therapeutics, Inc.,* 899 F.3d 988, 1003 (9th Cir. 2018). Thus, when we a document, or in this instance a partial video, is incorporated by reference into a complaint, when ruling on a motion to dismiss district courts are still prohibited from resolving factual disputes at the

55

pleading stage. *Id.*; *See also In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016) ("At the motion to dismiss phase, the trial court must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff.") Here, the district court attempted to resolve clear factual disputes revolving around whether Ms. Jenkins presented a serious medical need, whether Durbin and Taub responded appropriately to that serious medical need, among other things, at the motion to dismiss stage, which is improper. These questions are more suited for summary judgment or before a trier of fact. The district court improperly ignored the allegations in Appellant's well-pled complaint and reached improper conclusions and resolved factual disputes in favor of Appellees at the motion to dismiss stage which is improper. Indeed, the district court referenced in its ruling that the written allegations were "superfluous" in light of the partial body cam footage, going as far as stating that they "contradicted" the claims in the FAC, however, never point to a single contradiction in Order. (1-ER-244:1-9). When reasoning the district court again referenced the original complaint, ignoring the FAC which was filed, which was improper as well. *Id.* As such, this Court should reverse the district court's decision dismissing Appellant's FAC and reverse and remanded for further proceedings.

## CONCLUSION

For all the foregoing reasons, the judgment below should be reversed and remanded.

## STATEMENT OF RELATED CASES

Plaintiff-Appellant is unaware of any related cases pending before this Court.

Dated: December 18, 2020                               NAVAB LAW, APC


                                        By:_____ /s/ Kaveh Navab _____

                                                Kaveh Navab

                                                *Attorney for Plaintiff-Appellant*

57

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 20-55622

I am the attorney or self-represented party.

**This brief contains** | 12,948 | **words,** excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated |   |.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Kaveh Navab | **Date** | December 18, 2020

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/2018*

# CERTIFICATE OF SERVICE

I hereby certify that on December 18, 2020, I electronically filed the foregoing

document APPELLANT J.K.J's OPENING BRIEF with the Clerk of

the Court for the United States Court of Appeals for the Ninth Circuit by using the

appellate CM/ECF system.

I hereby certify that all participants in the case are registered CM/ECF users

and that service will be accomplished by the appellate CM/ECF system.

Dated: December 18, 2020      By:_____ /s/ Kaveh Navab_____

                                        Kaveh Navab