**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| J. K. J., individually, and successor in interest to the Deceased Aleah Jenkins, by and through his guardian-ad-litem Jeremy Hillyer,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>CITY OF SAN DIEGO, a public entity; DAVID NISLET, in his individual capacity and official capacity as Police Chief of the San Diego Police Department; LAWRENCE DURBIN, an individual; JASON TAUB, an individual; DOES, 1–10, Inclusive,<br>*Defendants-Appellees*,<br><br>and<br><br>NICHOLAS CASICOLA,<br>*Defendant.* | No. 20-55622<br><br>D.C. No.<br>3:19-cv-02123-CAB-RBB<br><br><br>ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Southern District of California
Cathy Ann Bencivengo, District Judge, Presiding

Argued and Submitted July 6, 2021
Pasadena, California

Filed November 15, 2021
Amended August 2, 2022

Before:  D. Michael Fisher,[*] Paul J. Watford, and
Patrick J. Bumatay, Circuit Judges.

Order;
Opinion by Judge Fisher;
Dissent by Judge Watford

---

## SUMMARY[**]

---

### Civil Rights

The panel filed (1) an order granting a petition for rehearing, denying as moot a petition for rehearing en banc, and amending the prior opinion and dissent; and (2) an amended opinion affirming the district court's dismissal of an action brought pursuant to 42 U.S.C. § 1983 alleging constitutional violations by police officers in their treatment of Aleah Jenkins, who was arrested at a traffic stop, fell ill while in police custody, and died nine days later.

When officers discovered, after stopping the car, that Jenkins was subject to arrest based on a warrant involving a prior methamphetamine offense, they handcuffed her and put her in defendant Durbin's cruiser.  Inside the cruiser,

---

[*] The Honorable D. Michael Fisher, United States Circuit Judge for the U.S. Court of Appeals for the Third Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Jenkins vomited, and defendant Taub called for paramedics but cancelled the call after Jenkins said she was pregnant and not detoxing.  On several occasions during the transport to the police station, Jenkins groaned and screamed for help.  After fingerprinting Jenkins at the police station, as she lay on her side, defendants placed her back in the cruiser.  About eleven and a half minutes later they found her unconscious, called for paramedics, and began CPR.  Jenkins fell into a coma and died nine days later.

The panel first held that the district court validly exercised its discretion in choosing to review a bodycam video that plaintiff had incorporated by reference into the amended complaint.  Second, the district court did not assign the video too much weight.  Lastly, to the extent the district court found that the video contradicted anything in the amended complaint, it rejected plaintiff's conclusory allegations regarding whether the officers' conduct met the legal standard of a constitutional violation.

The panel held that the district court did not err in dismissing the amended complaint.  Addressing the municipal liability claim brought under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978), the panel held that the complaint did not plausibly allege that any City policy or custom "was the moving force" behind the constitutional violations Jenkins allegedly suffered.  Rather the allegations suggested that that the moving force behind the alleged constitutional violation was not a failure to train, but the officers' failure to heed their training.

The panel held that the alleged violative nature of the officers' conduct, in failing to recognize and respond to Jenkins' serious medical need, was not clearly established in the specific context of this case.  None of the cases cited by

Jenkins presented circumstances where an officer had to grapple with how to handle a detainee who exhibited signs of medical distress but explained them away. Defendants therefore did not violate clearly established law and were entitled to qualified immunity under the second prong of the qualified immunity test.

Dissenting in part, Judge Watford stated that the majority opinion offered a truncated and highly sanitized account of the events giving rise to this lawsuit, at least as alleged by the plaintiff. Although at this stage of the case the panel was required to accept the plaintiff's factual allegations as true, the majority opinion ignored most of the facts alleged in the complaint. The complaint also expressly incorporated by reference the contents of a publicly available body camera video that captures many of the relevant events, yet the majority opinion turned a blind eye to most of what that video depicted as well. The plaintiff's complaint plausibly alleged that Jenkins, a young African-American woman, died in police custody because the officer responsible for transporting her to police headquarters took no action when she experienced an acute medical emergency. Judge Watford would reverse the district court's dismissal of the claims against Officer Durbin and remand for further proceedings.

**COUNSEL**

Kaveh Navab (argued), Navab Law APC, Marina Del Rey, California, for Plaintiff-Appellant.

Seetal Tejura (argued), Chief Deputy City Attorney; George F. Schaefer, Assistant City Attorney; Mara W. Elliott, City Attorney; Office of the City Attorney, San Diego, California; for Defendants-Appellees.

**ORDER**

The panel unanimously votes to **GRANT** the petition for panel rehearing filed December 13, 2021. The opinion filed November 15, 2021, and appearing at 17 F.4th 1247, is amended by the opinion filed concurrently with this order. Judge Watford's dissent is also amended by the dissent filed concurrently with this order. Because we grant the petition for panel rehearing, the petition for rehearing en banc is moot. Further petitions for rehearing en banc may be filed.

**OPINION**

D.M. FISHER, Circuit Judge:

Aleah Jenkins was arrested at a traffic stop and fell ill in police custody. Tragically, she died nine days later. Her minor son, J.K.J., brought constitutional claims against the City of San Diego and two officers who participated in the traffic stop. The District Court dismissed J.K.J.'s amended complaint with prejudice. Because we conclude the officers did not violate clearly established law and thus are protected by qualified immunity, we affirm.

# BACKGROUND

## I. Factual History

We accept as true all factual allegations in the amended complaint, construing them in the light most favorable to J.K.J., the non-moving party. *Fields v. Twitter, Inc.*, 881 F.3d 739, 743 (9th Cir. 2018). We also draw on a bodycam video that J.K.J. incorporated into the amended complaint by reference. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

On November 27, 2018, San Diego police officers Nicholas Casciola and Jason Taub stopped a Cadillac with an expired registration. A third officer, Lawrence Durbin, arrived to provide backup. Inside the Cadillac sat three people: two men in the front, and Jenkins in the back. The two men had prior convictions for drug offenses. The officers knew or became aware of these prior convictions as they investigated.

Durbin questioned Jenkins, who spoke coherently and showed no signs of distress. When the officers discovered that she was subject to arrest based on a warrant involving a prior methamphetamine offense, they handcuffed her and put her in Durbin's cruiser.

With all three passengers secured, the officers searched the Cadillac. They found "a saran wrap-like plastic . . . known to law enforcement officers . . . as being commonly used for narcotics sale." They also found two wallets, one of which was full of cash. They did not find any drugs.

Inside Durbin's cruiser, Jenkins vomited. Taub called for paramedics and asked Jenkins if she was detoxing. Durbin asked if she was withdrawing. Jenkins responded: "No, I'm

sick[,] my stomach is turning." She then added, "I'm pregnant." Hearing this explanation, Durbin told Taub, "Don't worry about it," indicating that paramedics were not needed. Taub approached Jenkins and asked: "Did you eat something, just for our knowledge?" She responded, "Mmm-mm," while shaking her head slightly from side to side.[1] Taub replied, "Alright, that's fine. We just wanna make sure you're gonna be ok." Durbin then remarked: "She says she's pregnant." The call to paramedics was canceled.

Durbin began driving Jenkins to a police station for fingerprinting. The trip took over an hour. En route, Jenkins told Durbin she did not want to go to jail. She requested water and a bathroom break. And on several occasions, she groaned and screamed. When Durbin spoke to her, Jenkins sometimes responded and sometimes remained silent. At one point she screamed loudly, "[P]lease help me, please help me!" and "[O]h my [G]od, please, stop, stop, stop!" Durbin asked, "What's going on?" When Jenkins remained silent for about ten minutes, Durbin stopped the car to check on her. He opened the rear door and patted her, saying, "I need you to stay awake." Jenkins then said, "I'm sick." When she again screamed, Durbin told her to "[k]nock it off." Jenkins shouted, "[H]elp me[,] please." Durbin responded, "[Y]ou're fine," and continued driving to the police station.

---

[1] On appeal, J.K.J. asserts that Jenkins was "nodding her head," and thus that her response to Taub was "conflicting[]." Appellant's Opening Br. 32. The amended complaint contains no such allegation. And the video J.K.J. incorporated by reference shows Jenkins move her head from side to side, not up and down. We rely on the incorporated video, not J.K.J.'s contradictory assertion in his appellate briefing.

On arrival, about three minutes later, Durbin opened the rear door and again patted Jenkins, who was lying face down across the backseat. Jenkins screamed and took several quick, audible breaths, to which Durbin responded: "Stop hyperventilating . . . you are doing [that] to yourself." Durbin then removed Jenkins from the cruiser to the pavement. Jenkins screamed and asked for help, and Durbin remarked to an approaching officer: "She doesn't want to go to jail." Shortly thereafter, Durbin and the other officer fingerprinted Jenkins as she lay on her side, handcuffed. Durbin asked Jenkins if she still wanted water, and she responded at a normal volume: "Yes, please." After confirming Jenkins' identity, Durbin and the other officer placed her back inside the cruiser.

About eleven and a half minutes later, Durbin opened the rear door of his cruiser. Jenkins had fallen unconscious. Durbin immediately removed her from the car and radioed for paramedics. Soon, another officer arrived with a breathing tool, and Durbin began CPR. He remarked to the gathering officers that Jenkins had a narcotics warrant, but that this was not a narcotics arrest. He then added, "She may have ingested something," telling the other officers that he had Narcan in his trunk. Paramedics arrived. Despite their efforts, Jenkins fell into a coma. Nine days later, she died. The amended complaint refers to Jenkins "suffering from an overdose," but does not identify a cause of death.

## II. Procedural History

In November 2019, J.K.J. filed this lawsuit by and through his father and personal representative, Jeremy Hillyer. The District Court granted the defendants' motion to dismiss, granting leave to amend. J.K.J. then filed the amended complaint at issue here, asserting three causes of action under 42 U.S.C. § 1983. The first, against Taub and

Durbin, was labeled "Unreasonable Search and Seizure—Denial of Medical Care (42 U.S.C. § 1983)." The second, against the City, asserted municipal liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690 (1978). And the third, against Taub and Durbin, was labeled "Deprivation of Life Without Due Process (42 U.S.C. § 1983)." The amended complaint also explicitly "incorporate[d] by reference" the "publicly available bodycam video of the interaction" between Jenkins and the officers.

The defendants again moved to dismiss. This time, the District Court granted the motion with prejudice. The Court reviewed the bodycam video and concluded that it comported with J.K.J.'s factual allegations. The Court also stated: "Th[e] video . . . renders any written allegations describing what occurred on November 27, 2018, somewhat superfluous because the Court is not 'required to accept as true allegations that contradict exhibits attached to the Complaint.'" Next, the Court concluded that "if the [amended complaint] could otherwise avoid dismissal," further briefing would be needed to determine whether, under California law governing survival actions, Jenkins' other children were required parties.[2]

On the merits, the District Court held that J.K.J.'s first cause of action failed to state a plausible claim for denial of medical care under the Fourteenth Amendment. The Court noted J.K.J.'s argument that the claim should instead be analyzed under a Fourth Amendment reasonableness

---

[2] J.K.J. mischaracterizes the District Court's analysis of this issue. Contrary to his assertion, the Court never concluded that he failed to meet California's requirements for bringing a survivorship action. It concluded only that Jenkins' other children might be required parties.

standard, but concluded that "it [fares] no better" under that standard. Additionally, the Court held that Taub and Durbin are entitled to qualified immunity. As to the second cause of action, the Court held that J.K.J. failed to state a claim under *Monell* because (1) the amended complaint alleged no plausible violation of Jenkins' constitutional rights; and (2) it failed to identify any municipal policy or custom as the cause of the alleged violation. Lastly, the Court dismissed the third cause of action, the "Deprivation of Life" claim, as duplicative of the claim for denial of medical care. J.K.J. timely appealed.

## JURISDICTION AND STANDARDS OF REVIEW

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction to review its final judgment under 28 U.S.C. § 1291.

"We review de novo . . . a district court's dismissal for failure to state a claim; a district court's decision on qualified immunity; and a district court's decision on municipal liability." *Benavidez v. County of San Diego*, 993 F.3d 1134, 1141 (9th Cir. 2021) (citations omitted). "Dismissal with prejudice and without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment." *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 939 (9th Cir. 2018) (quoting *Harris v. County of Orange*, 682 F.3d 1126, 1131 (9th Cir. 2012)). Additionally, we review the decision to incorporate documents by reference for an abuse of discretion. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

## ANALYSIS

### I. The District Court did not err in relying on the incorporated video.

At the outset, we address J.K.J.'s argument that the District Court erred by giving too much weight to the bodycam video he incorporated by reference into the amended complaint. J.K.J. says the Court improperly allowed that video to override his written allegations, using it to resolve factual disputes and effectively converting the defendants' motion to dismiss into a motion for summary judgment. We disagree.

"Ordinarily, a court may look only at the face of the complaint to decide a motion to dismiss." *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002). However, "[u]nder the 'incorporation by reference' rule of this Circuit, a court may look beyond the pleadings without converting the Rule 12(b)(6) motion into one for summary judgment." *Id.* Specifically, a court may consider documents "incorporated into the complaint by reference." *Tellabs*, 551 U.S. at 322. Such documents are "assume[d] . . . [to be] true for purposes of a motion to dismiss." *Khoja*, 899 F.3d at 1003 (quoting *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006)). Thus, where the complaint makes "conclusory allegations that are contradicted by documents referred to [or incorporated] in the complaint," a court may decline to accept such conclusory allegations as true. *Tritz v. U.S. Postal Serv.*, 721 F.3d 1133, 1135 n.1 (9th Cir. 2013). On the other hand, "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute *facts* stated in a well-pleaded complaint." *Khoja*, 899 F.3d at 1003 (emphasis added).

The District Court heeded these principles in reviewing the bodycam video at issue here. First, the Court validly exercised its discretion in choosing to review the video, because J.K.J. explicitly incorporated it by reference. This much J.K.J. concedes. Second, the Court did not assign the video too much weight. At no point did it allow the video to "replac[e] or supersed[e] . . . the allegations in the [amended complaint]," as J.K.J. contends. Appellant's Opening Br. 55. On the contrary, the District Court found that the video was "consistent with" J.K.J.'s factual allegations. Although the Court stated in dicta that the existence of the video "renders any written allegations . . . somewhat superfluous," it then proceeded to treat J.K.J.'s written allegations as essential for deciding the motion to dismiss. For instance, the Court quoted the amended complaint's allegation that Taub and Durbin knew Jenkins' outstanding warrant involved methamphetamine, and knew the Cadillac's other occupants had prior arrests for selling drugs. Likewise, the Court cited and relied upon J.K.J.'s written allegations concerning the police training Taub and Durbin received.

Lastly, the District Court did not assume the video to be true "only . . . to dispute *facts* stated in" J.K.J.'s pleadings. *Khoja*, 899 F.3d at 1003 (emphasis added). To the extent it found that the video contradicted anything in the amended complaint, it rejected J.K.J.'s "conclusory allegations" regarding whether the officers' conduct met the legal standard of a constitutional violation. *Tritz*, 721 F.3d at 1135 n.1. In this, the Court acted within its discretion.

## II. The District Court did not err in dismissing the amended complaint.

We turn now to the heart of J.K.J.'s appeal—his argument that the District Court erred by dismissing his amended complaint for failure to state a claim. We consider

J.K.J.'s claims against the City and the individual officers in turn.

## A. *Monell* Claim

J.K.J.'s sole claim against the City was a municipal liability claim under *Monell*. According to the amended complaint, the City violated Jenkins' constitutional rights by employing officers with "dangerous propensities," by failing adequately to train and supervise those officers, and by failing to ensure that arrestees receive proper medical treatment.

"To bring a § 1983 [*Monell*] claim against a local government entity, a plaintiff must plead that a municipality's policy or custom caused a violation of the plaintiff's constitutional rights." *Ass'n for L.A. Deputy Sheriffs v. Cnty. of Los Angeles*, 648 F.3d 986, 992–93 (9th Cir. 2011). Here, J.K.J. had to plead facts alleging that "(1) [Jenkins] was deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to [Jenkins'] constitutional right; and (4) the policy was the moving force behind the constitutional violation." *Lockett v. Cnty. of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020).

We conclude the amended complaint fell short of this standard. We limit our discussion to just one of the four enumerated elements, because this suffices to show that dismissal was warranted. J.K.J. did not plausibly allege that any City policy or custom "was the moving force" behind the constitutional violations Jenkins allegedly suffered. *Id.* On appeal, J.K.J. insists otherwise. He says he adequately asserted a causal link by tracing Jenkins' death back to the City's alleged failure to train and supervise its police officers. But the record belies this claim. The amended

complaint attributes to the City, in broad terms, a "custom, policy, and practice of . . . inadequately supervising, training, controlling, assigning, and disciplining" officers. But even recognizing that "a failure to train can be a 'policy' under *Monell*," *Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1159 (9th Cir. 2012), J.K.J. alleged no facts that would indicate any "deficiency in training actually caused the police officers' [alleged] indifference to [Jenkins'] medical needs," *City of Canton v. Harris*, 489 U.S. 378, 391 (1989). On the contrary, the amended complaint claimed that San Diego officers "are trained in accordance with . . . Police Department policies to take immediate action to summon medical care" in circumstances like those Taub and Durbin encountered when they met Jenkins. Indeed, J.K.J. alleged that Durbin acted "in direct contravention to the policy and training of the . . . Department." These allegations suggest that the moving force behind the alleged constitutional violation was not a failure to train, but the officers' failure to heed their training.

J.K.J. resists this conclusion. He appears to argue that the officers' alleged deviation from training indicated "the need for more or different training." *Harris*, 489 U.S. at 390. But the amended complaint never identified what additional training was required beyond what Taub and Durbin received. Nor did it allege facts indicating that this supposed failure to enhance officer training was the moving force behind Jenkins' injuries. Accordingly, J.K.J. failed to state a claim for municipal liability.

## B. Claims Against Taub and Durbin

Next, we consider J.K.J.'s claims against the individual officers, Taub and Durbin. These included (1) a survivorship claim—that is, Jenkins' own claim, brought by J.K.J. on her behalf—for denial of medical care; and (2) a seemingly

duplicative claim for deprivation of life without due process. We address each in turn.

### 1. Denial of Medical Care

Turning first to the denial of medical care claim, J.K.J. contends the District Court erred in three respects. First, the Court did not apply a Fourth Amendment standard in addition to a Fourteenth Amendment analysis. Second, it improperly concluded that he failed to state a plausible claim that Officer Durbin was deliberately indifferent to Jenkins' serious medical need. And third, it found that Taub and Durbin are entitled to qualified immunity. Because we affirm that Taub and Durbin are entitled to qualified immunity, we do not address J.K.J.'s other two arguments.

"Qualified immunity shields government officials under § 1983 unless '(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.'" *Rico v. Ducart*, 980 F.3d 1292, 1298 (9th Cir. 2020) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018))*.* When performing a qualified immunity analysis, courts have discretion to decide which of these two prongs to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If analysis under one prong proves dispositive, we need not analyze the other. *See id.* at 236, 241–43. Under both prongs, the plaintiff bears the burden of proof. *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017). We begin with the clearly established prong. Thus, unless J.K.J. can show that on the date the officers encountered Jenkins, it was clearly established that their conduct was unlawful, qualified immunity applies under prong two.

In analyzing whether rights are clearly established, we look to then-existing "cases of controlling authority" or, absent such cases, to a "consensus" of persuasive authorities. *Evans v. Skolnik*, 997 F.3d 1060, 1066 (9th Cir. 2021) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates [it]." *Rico*, 980 F.3d at 1298 (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). The Supreme Court has cautioned that we do not analyze whether rights are clearly established "at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). Nor do we take the extreme opposite approach, requiring a prior case "on all fours." *Rico*, 980 F.3d at 1298. Our inquiry, instead, is whether "the violative nature of [the defendant's] *particular* conduct is clearly established . . . in light of the *specific context* of the case.'" *Id.* (quoting *Hamby v. Hammond*, 821 F.3d 1085, 1091 (9th Cir. 2016)). Qualified immunity thus protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Wesby*, 138 S. Ct. at 589).

J.K.J. argues that a reasonable officer in Durbin and Taub's position would have been on fair notice that his conduct violated clearly established law. He cites three binding authorities to support this proposition. *See Frost v. Agnos*, 152 F.3d 1124 (9th Cir. 1998); *Gibson v. Cnty. of Washoe*, 290 F.3d 1175 (9th Cir. 2002), *overruled on other grounds by Castro*, 833 F.3d at 1076; *McGuckin v. Smith*, 974 F.2d 1050 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997). He says *Frost* and *Gibson* clearly establish that pretrial detainees have the right not to have their serious medical needs treated with deliberate indifference. And he says *McGuckin* clearly establishes that deliberate

indifference exists where an official "purposefully ignore[s] or fail[s] to respond to a [detainee's] pain or possible medical need." 974 F.2d at 1060. Setting aside whether J.K.J. accurately states the holdings of these cases, the problem with his argument is that "general rules" like the ones he posits "do not by themselves create clearly established law outside an 'obvious case.'" *Kisela*, 138 S. Ct. at 1153 (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)). J.K.J. makes no attempt to show that *Frost*, *Gibson*, or *McGuckin* involved factual contexts akin to the context of this case.

Our review demonstrates that two of them plainly did not. In *Frost*, prison officials knew the plaintiff had a broken leg and needed crutches to get around, yet denied him an accessible shower and, in some cases, refused to help him climb stairs. 152 F.3d at 1127–29. There was no question of a failure to recognize the detainee's medical need. Similarly, in *McGuckin*, the issue was not a failure to recognize the detainee's need for surgery, but excessive delays in performing it. 974 F.2d at 1061–62.

That leaves *Gibson*. In broad terms, *Gibson* contains echoes of this case, in that it involved a failure by law enforcement to recognize a detainee's serious medical need—specifically, his manic state caused by mental illness. 290 F.3d at 1180–83. But *Gibson* did not establish that conduct like Durbin's is unlawful; if anything, it established the opposite. Our holding was that the deputies who mistook the detainee's symptoms for mere anger or intoxication were *not* deliberately indifferent, because "all [they] knew about [his] mental condition was what they could observe of his behavior" and that behavior did not "obviously" connote serious illness. *Id.* at 1197.

Even if our holding in *Gibson* had been otherwise, that case involved a meaningfully distinct factual context.

Although both incidents required officers to interpret a detainee's medical condition, the detainee in *Gibson* never plausibly informed the officers that his symptoms had an innocuous explanation. Here, the officers asked Jenkins whether she was withdrawing or detoxing, and she responded no, explaining that she was sick, her stomach was turning, and she was pregnant. A few moments later, Taub asked Jenkins directly: "Did you eat something, just for our knowledge?" Jenkins, no longer vomiting, responded "mmm-mm" while shaking her head slightly from side to side. Taub then replied: "Alright, that's fine. We just wanna make sure you're gonna be ok." Jenkins next asked for a napkin to clean herself up—"C'mon, man, I'm too pretty for this"—but said nothing to indicate she might require medical aid. And while driving to the police station, Jenkins explained to Durbin she did not want to go to jail. The dissent's characterization of Jenkins' medical need as "obvious" ignores this critical context. Neither *Gibson* nor the other two cases cited by J.K.J. presented circumstances where an officer had to grapple with how to handle a detainee who exhibited signs of medical distress but explained them away.[3]

---

[3] The dissent adds that *Sandoval* clearly establishes the right to adequate medical care in "highly analogous" circumstances. But *Sandoval* is insufficiently analogous for the same reason as the cases cited by J.K.J.: the official knew or should have known the detainee had a serious medical need. *Sandoval* held that a nurse violated clearly established law when he largely ignored a detainee whom he was told needed medical attention. *Sandoval*, 985 F.3d at 680. In that case, the nurse "made essentially no effort to determine why Sandoval was suffering the symptoms reported by [another deputy], nor did he attempt to treat those symptoms." *Id.* Here, it is undisputed that Officer Durbin attempted multiple times to determine why Jenkins was acting the way she was.

J.K.J. fails to satisfy the clearly established prong of the qualified immunity test with binding precedent, so he turns instead to the decisions of district courts. He cites four such decisions, two of them unpublished. As a rule, we hesitate to rely on district court decisions when determining clearly established law. *See Evans*, 997 F.3d at 1067. That is because, "as the Supreme Court has pointed out, 'district court decisions—unlike those from the courts of appeals—do not necessarily settle constitutional standards.'" *Id.* (quoting *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011)). Even if we were to rely on the cases cited by J.K.J., four hardly make a "consensus of cases of persuasive authority." *Id.* at 1066 (quoting *Wilson*, 526 U.S. at 617). And finally, even on J.K.J.'s own telling, three of the four do not fit this case: in one, he says, the officer (unlike Taub and Durbin) "was aware" the detainee was under the influence of drugs; in another, the officers (again unlike Taub and Durbin) "were told [the detainee] was overdosing"; and in a third, the court concluded the officers were entitled to qualified immunity. Appellant's Opening Br. 37–38 n.5. In sum, J.K.J. has failed to carry his burden of showing that the alleged unlawfulness of the officers' conduct was clearly established at the time they encountered Jenkins. We conclude that Taub and Durbin are entitled to qualified immunity under prong two, and that the District Court properly dismissed J.K.J.'s denial of medical care claim against them.[4]

---

[4] We must pause here to address the dissent's critique of our qualified immunity analysis. The dissent asserts that the second prong turns on whether an accused officer made a mistake of fact or a mistake of law. According to the dissent, if an officer made a mistake of law, the Court looks to precedent for factually analogous circumstances showing that the law was clearly established; but if the officer made a mistake of fact, the Court simply evaluates that mistake for reasonableness without

## 2. Deprivation of Life Without Due Process

We turn, next, to J.K.J.'s claim for deprivation of life without due process. The District Court dismissed this claim as duplicative of the denial of medical care claim. J.K.J. contends this was error, insisting that he pleaded an entirely distinct cause of action—his own claim for the "depriv[ation] of his liberty interest in the companionship and society of his parent." Appellant's Opening Br. 52.

J.K.J. never presented this argument to the District Court. The defendants, in moving to dismiss both the original complaint and the amended complaint, asserted that

---

looking to precedent. Not so. We have repeatedly held that courts should look to precedent for evidence that the unlawfulness of an officer's conduct is clearly established. To find an example, we need only look so far as the cases cited by the dissent. *See Jensen v. City of Oxnard*, 145 F.3d 1078, 1085–86 (9th Cir. 1998) (evaluating the accused officer's shooting of a fellow officer he mistook for a suspect against previous excessive force cases involving officer-on-officer shootings); *Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003) (comparing the accused officers' shooting of a fellow officer they mistook for a suspect to the officer's shooting in *Jensen*); *Torres v. City of Madera*, 648 F.3d 1119, 1128–29 (9th Cir. 2011) (likening the accused officer's misidentification of a gun as a taser to the officers' misidentification of officers as suspects in *Jensen* and *Wilkins*). Even assuming Officer Durbin made a mistake of fact, he would still be entitled to qualified immunity if he was also mistaken about his legal obligations on summoning medical care when an arrestee is experiencing a non-obvious medical emergency. *See Pearson*, 555 U.S. at 231 ("The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting))). To analyze Officer Durbin's legal obligations, we still must turn to precedent to look for a clearly established right. So even under the dissent's framework, we cannot ignore precedent.

J.K.J.'s deprivation claim was "a duplication [of] and redundant [of]" the claim for denial of medical care. In the District Court's first dismissal of this case, it concluded the deprivation claim was duplicative and specifically noted that "plaintiff [had] not argue[d] otherwise." Despite this warning from the Court in its first order and the defendants' explicit argument the claim was duplicative in its second motion, J.K.J again failed to dispute that the deprivation claim was duplicative in its opposition. To be sure, plaintiff generally opposed dismissal, incorporating by reference his arguments about the denial of medical care claim, and writing: "Plaintiff agrees that this cause of action is governed by the same objective deliberate indifference standard under [the] Fourteenth Amendment's due process clause." But nowhere does he explain why the claim is not duplicative. This lack of rebuttal must be categorized as a concession.

We generally do not "entertain[] arguments on appeal that were not presented or developed before the district court." *Villanueva v. California*, 986 F.3d 1158, 1164 n.4 (9th Cir. 2021) (quoting *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010)). J.K.J. offers no reason why we should not follow that rule here. Accordingly, we conclude that his argument concerning the deprivation of life claim "has been waived." *Momox-Caselis v. Donohue*, 987 F.3d 835, 842 (9th Cir. 2021).

\* \* \*

For the reasons stated above, the District Court did not err in dismissing J.K.J.'s amended complaint. J.K.J. draws our attention to the fact that the Court's dismissal was with prejudice and without leave to amend. But he never squarely challenges that aspect of the Court's decision. Merely mentioning it is not enough: "[W]e cannot 'manufacture arguments for an appellant' and . . . will not consider . . .

claims that were not actually argued in [the] appellant's opening brief." *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) (quoting *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994)). Accordingly, we do not address whether denial of leave to amend was warranted.

## CONCLUSION

For the foregoing reasons, the order of the District Court is **AFFIRMED.**

---

WATFORD, Circuit Judge, dissenting in part:

The majority opinion offers a truncated and highly sanitized account of the events giving rise to this lawsuit, at least as alleged by the plaintiff. Although at this stage of the case we are required to accept the plaintiff's factual allegations as true, the majority opinion ignores most of the facts alleged in the complaint. The complaint also expressly incorporates by reference the contents of a publicly available body camera video that captures many of the relevant events, yet the majority opinion turns a blind eye to most of what that video depicts as well.

The plaintiff's complaint plausibly alleges that Aleah Jenkins, a young African-American woman, died in police custody because the officer responsible for transporting her to police headquarters took no action when she experienced an acute medical emergency. Over the course of an hour-long drive, Officer Lawrence Durbin disregarded obvious signs of Ms. Jenkins's medical distress, evidently because he thought she was "faking" her symptoms as part of a ploy to avoid going to jail. As I will explain, J.K.J., the plaintiff in

this case and Ms. Jenkins's minor son, has plausibly alleged that no reasonable officer in Officer Durbin's shoes could have viewed Ms. Jenkins's rapidly deteriorating medical condition as some kind of ruse.

Whether J.K.J. can prove this last claim is the key factual issue that must be resolved by the trier of fact; it cannot be resolved on a motion to dismiss. If a jury ultimately resolves this key factual issue in J.K.J.'s favor, he will be entitled to prevail notwithstanding the defense of qualified immunity because the law governing Officer Durbin's actions at the time was crystal clear: He was required to summon immediate medical care for Ms. Jenkins. He instead did nothing, despite objective signs of medical distress that literally cried out for action. Crediting J.K.J.'s well-pleaded allegations as true, Ms. Jenkins died as a direct result of Officer Durbin's deliberate indifference to her medical needs. I would reverse the district court's dismissal of the claims against Officer Durbin and remand for further proceedings.[1]

I

Before summarizing the complaint's allegations, let me say a word about the video at the center of this case. According to the complaint, the San Diego County District Attorney's Office publicly released the video after investigating Officer Durbin's potential criminal culpability for Ms. Jenkins's death. The roughly 90-minute video consists largely of footage taken from Officer Durbin's body camera during the incident, although an important 11-minute

---

[1] I agree that J.K.J. has not adequately alleged claims against Officer Jason Taub or the City of San Diego, and I would accordingly affirm the district court's dismissal of the claims against those defendants.

segment of the footage has been edited out and the audio is temporarily muted at several junctures.  I include a link to the video here,[2] albeit with some misgivings.  The video depicts Ms. Jenkins's agonizing final hours of life.  Out of respect for her family, I would not have drawn further attention to it but for the fact that J.K.J.'s complaint makes its contents part of the factual allegations we must review in order to decide whether his case may proceed.

What follows is a detailed summary of the complaint's allegations, as augmented by the video's footage.  At this stage, we must accept the complaint's allegations as true unless they are "blatantly contradicted" by the video, and we must draw all reasonable inferences from the video in J.K.J.'s favor.  *Scott v. Harris*, 550 U.S. 372, 378, 380 (2007).  To allow readers to judge for themselves whether anything in the video blatantly contradicts the complaint's allegations, I have included references to the timestamp that appears in the lower left-hand corner of the video.  Far from contradicting the complaint's allegations, the video supports virtually every one of them.

The events leading to Ms. Jenkins's death started with a routine traffic stop on the afternoon of November 27, 2018.  San Diego police officers pulled over a car in which Ms. Jenkins was a passenger because the car had expired registration tags.   When officers first encountered Ms. Jenkins, she was alert, responsive, and seated upright in the back seat.  *See* First Amended Complaint (FAC) ¶ 27.[3] She provided her name and date of birth to Officer Durbin

---

[2] https://www.youtube.com/watch?v=-cx5dQ_u04k&has_verified=1

[3] The first amended complaint may be found at pages 114–43 of the Excerpts of Record (Dkt. No. 13).

and exhibited no signs of illness, much less any sort of medical distress.  She answered the officers' questions cooperatively and told them she was on probation.

Officers learned that Ms. Jenkins had an outstanding warrant for her arrest arising out of a prior methamphetamine offense.  One of the officers asked her to step out of the car, and she did so on her own without difficulty.  FAC ¶ 28; Video at 2:15–2:30.  She stood without assistance as one of the officers searched her and, when asked to do so, unclasped and removed a bracelet she was wearing.  Video at 2:35–3:05.  She then placed her hands behind her back and was handcuffed.  She walked without assistance to a patrol car and sat in the back seat as directed.  Video at 6:15–6:35.  Meanwhile, officers conducted a search of the car in which Ms. Jenkins had been riding, which turned up empty wads of plastic wrap commonly used for drug sales.  FAC ¶ 28; Video at 9:05–9:30.

Officer Durbin asked Ms. Jenkins to step out of the patrol car in which she had been sitting and asked her to walk to his patrol car, since he would be the one transporting her for booking.  She again walked on her own and got into the back seat of Officer Durbin's patrol car without difficulty, despite having her hands cuffed behind her back.  FAC ¶ 30; Video at 9:55–10:25.  Officer Durbin commented on Ms. Jenkins's compliance with the officers' instructions during this time, noting that she was being "straight up with [them.]"  FAC ¶ 31; Video at 9:55–10:20.

Roughly 45 minutes after the traffic stop began, while sitting in the back seat of Officer Durbin's patrol car waiting to leave the scene, Ms. Jenkins vomited, repeatedly.  FAC ¶¶ 32–33; Video at 11:35–12:30.  Officer Durbin walked over and asked Ms. Jenkins why she was throwing up.  She told him, "I'm sick," and continued to vomit.  Officer Durbin

asked Ms. Jenkins if she was "withdrawing," and another officer on the scene, Officer Jason Taub, asked if she was "detoxing." Ms. Jenkins told them, "No, I'm sick, my stomach is turning," as she continued to dry-heave. FAC ¶ 33. Officer Durbin asked Officer Taub to call the paramedics, but after Ms. Jenkins told Officer Durbin that she was pregnant, he told Officer Taub to cancel the call. FAC ¶ 35. Officer Taub asked Ms. Jenkins if she had eaten something, but she shook her head to indicate that she had not. Video at 12:35–12:45.

I agree with my colleagues that, to this point, nothing had transpired to suggest that Ms. Jenkins was in medical distress or that she needed immediate medical attention. Maj. op. at 17–18. Her vomiting was cause for concern, but it could at least arguably be explained by her claim that she was pregnant. For that reason, the district court correctly dismissed J.K.J.'s claims against Officer Taub, as he had no further interactions with Ms. Jenkins and nothing he had witnessed triggered a duty to summon medical care.

Officer Durbin was tasked with driving Ms. Jenkins— who sat alone in the back seat of his patrol car—to a local jail for booking. Because Ms. Jenkins had once been arrested on her twin sister's warrant, Officer Durbin first had to drive Ms. Jenkins to police headquarters for fingerprinting so that her identity could be confirmed. Due to heavy rush-hour traffic, the drive took more than an hour. During that period, as detailed in the paragraphs that follow, Ms. Jenkins's condition deteriorated markedly.

For the first part of the drive, Ms. Jenkins sits quietly in the back seat, exhibiting no signs of illness. Other than asking Officer Durbin a few questions and commenting at one point that she does not want to go to jail, Ms. Jenkins remains silent. Roughly 20 minutes into the drive, however,

she begins groaning and breathing irregularly. The complaint describes this labored breathing as "panting," and that is a fair characterization based on what can be heard on the footage from Officer Durbin's body camera. FAC ¶ 42; Video at 31:00–32:45. A few minutes later, Ms. Jenkins begins intermittently screaming and moaning for more than two minutes. Video at 36:55–39:35. Five minutes after that, as the complaint alleges and the video confirms, Ms. Jenkins's "continual groaning, screaming and panting increases and becomes louder." FAC ¶ 43; Video at 45:20.

A brief period of silence ensues, but Ms. Jenkins suddenly screams again in apparent anguish. "Please help me, please help me!" she pleads, followed by, "Oh my God, please stop, stop, stop!" FAC ¶ 45. Her speech is slurred, her tone of voice is unmistakably that of someone in distress, and her breathing is irregular, as though she is hyperventilating. Video at 1:04:40–1:05:30. Officer Durbin, obviously concerned, asks Ms. Jenkins, "What's going on?" along with a series of follow-up inquires, such as whether she needs water. After five minutes elapse without any audible response from Ms. Jenkins, Officer Durbin turns around and peers into the back seat with his flashlight to check on her. The video does not show what he sees, but as he turns back around, he says to himself, "Alright, still breathing." Video at 1:09:50–1:10:10.

Another five minutes pass without any audible response from Ms. Jenkins, and Officer Durbin pulls off to the side of the road to check on her again. He gets out of the car and walks around to the rear passenger-side door. Ms. Jenkins is lying on her side across the back seat, and her head must have been leaning against the door because when Officer Durbin opens it, her head tumbles out of the car in a manner suggesting that she is either unconscious or dead asleep.

FAC ¶ 47; Video at 1:14:20–1:14:35. As the complaint alleges and the video confirms, Ms. Jenkins is listless and continues to exhibit an "abnormally rapid rate of breathing." FAC ¶ 47. Officer Durbin tells Ms. Jenkins, "I need you to stay awake." In order to shut the door, he has to push her head back across the threshold into the car. Video at 1:14:30–1:14:40. As he does so, Ms. Jenkins pleads with him, "I'm sick." FAC ¶ 47.

When Officer Durbin gets back into his patrol car, Ms. Jenkins screams, "Help me please!" FAC ¶ 50; Video at 1:14:50–1:15:00. He responds by telling her to "knock it off." Ms. Jenkins again pleads, "Help me please." Officer Durbin responds by saying, "You're fine" and again tells her to "knock it off." FAC ¶ 50. Ms. Jenkins continues to cry out, "Help me . . . I'm telling you I can't—," but what she says after that is unintelligible. FAC ¶ 50; Video at 1:15:10–1:15:25.

At this point, as the complaint plausibly alleges, Officer Durbin "is faced with the objective signs of a serious medical emergency," given the drastic decline in Ms. Jenkins's condition between the time he first encountered her—when she was alert, responsive, and appeared perfectly fine—and now. FAC ¶ 47. Despite observing "the objective signs of her serious medical needs," Officer Durbin did not summon medical care for Ms. Jenkins or even radio ahead to police headquarters to have medical personnel on hand awaiting their arrival. FAC ¶¶ 47–48. The complaint plausibly alleges that any reasonable officer in these circumstances "would have known that there was a high degree of risk in not summoning medical attention" for Ms. Jenkins. FAC ¶ 49.

Several minutes after pulling over to check on Ms. Jenkins, Officer Durbin arrives at police headquarters

and drives into the parking garage.  When he opens the rear door of his patrol car, Ms. Jenkins is lying face down on the back seat and appears to be unconscious.  FAC ¶ 53; Video at 1:17:17.  Officer Durbin taps Ms. Jenkins on the back repeatedly to rouse her, but she remains face down, breathing abnormally fast.  Officer Durbin tells Ms. Jenkins, "Stop hyperventilating . . . you are doing that to yourself." FAC ¶ 53; Video at 1:17:40–1:18:05.  As the complaint plausibly alleges and the video confirms, while Officer Durbin stands observing Ms. Jenkins, "her body [begins] twitching and shaking while lying face down in the back seat."  FAC ¶ 53; Video at 1:17:50–1:18:20.  Yet, despite "all of the above objective signs of distress and a medical emergency," Officer Durbin "made no effort to summon paramedics, medical care, or have Jenkins evaluated by medical staff that [were] present at the station."  FAC ¶ 53.

Instead of summoning medical help, Officer Durbin proceeds with fingerprinting Ms. Jenkins.  He asks her to get out of the car but receives no response.  Officer Durbin then pulls Ms. Jenkins out of the car by her arms, instructing her to try to get her legs underneath her as her torso clears the car door's threshold.  Her body is limp, she appears unable to stand on her own, and her legs simply flop to the ground, rag doll-like.  Video at 1:18:45–1:19:05.  As Officer Durbin drags Ms. Jenkins out of the car in this manner, she screams in distress and is breathing abnormally fast.  FAC ¶ 54.

Now lying on her side on the parking garage floor, Ms. Jenkins quietly mumbles, "Help me," but Officer Durbin ignores her and tells an approaching officer, "She doesn't want to go to jail."  FAC ¶ 54.  As Officer Durbin speaks with the other officer about the mechanics of fingerprinting, Ms. Jenkins remains on the ground, twitching, mumbling incoherently, and breathing

abnormally fast.  FAC ¶¶ 54–55; Video at 1:19:05–1:20:00.
Officer Durbin asks Ms. Jenkins if she wants water, but she
lies listless on the ground and does not respond.**⁴**

Officer Durbin and the other officer take hold of
Ms. Jenkins's arms, which are still handcuffed behind her
back, and press each of her index fingers onto a mobile
fingerprinting unit while she lies on the parking garage
pavement.  Despite being able to walk on her own less than
90 minutes earlier, Ms. Jenkins does not appear capable of
even sitting up under her own power.  FAC ¶ 56.  She
appears to be going in and out of consciousness, and her
body twitches and shakes.  FAC ¶ 56; Video at 1:21:20–
1:22:05.

Officer Durbin and the other officer have to lift
Ms. Jenkins up off the ground to put her back in the patrol
car.  The officers struggle to get her into the back seat
because she appears to have no control over her limbs.
Frustrated by Ms. Jenkins's lack of cooperation with their
efforts to get her back in the car, Officer Durbin tells her,
"This isn't going to go well, Ms. Jenkins, this is going to lead
to an extra charge."  Video at 1:23:05–1:23:20.  As he and
the other officer struggle to get Ms. Jenkins into the car, he
yells at her, "Stand up . . . stop faking," to which Ms. Jenkins
feebly responds, "I'm not."  FAC ¶ 56; Video at 1:23:20–
1:23:35.  At this point, it is obvious that she cannot stand on

---

**⁴** As the majority opinion notes, a short time later, Officer Durbin
asks Ms. Jenkins again if she wants water and this time she responds,
"Yes, please."  Maj. op. at 8; Video at 1:22:40.  The majority opinion
states that Ms. Jenkins gave this response "at a normal volume."  Maj.
op. at 8.  If that odd observation is meant to suggest that Ms. Jenkins was
behaving as an ordinary, healthy individual would, it is grossly
misleading.

her own, in stark contrast to her earlier ability to enter and exit the patrol car without difficulty.

To get Ms. Jenkins into the car, Officer Durbin has to lift her entire body up and place her face first onto the back seat. FAC ¶ 57. Her body is completely limp, and her legs and lower torso hang out of the open car door. Video at 1:23:40–1:23:50. The other officer pulls Ms. Jenkins's upper body across the backseat from the other side of the car, and Officer Durbin folds her legs into the car so that he can close the door. FAC ¶ 57; Video at 1:23:45–1:24:00.

Ms. Jenkins is now locked in the back seat of the patrol car, lying face down, handcuffed, and in obvious medical distress. Officer Durbin nonetheless walks away and does not return for more than 11 minutes. Video at 1:24:00–1:24:10 (timestamp in upper right-hand corner skipping from 2:02:33 to 2:14:10). It is unclear from the record what he does during this interval because this segment of his body camera footage has been edited out of the video.

It is clear, however, that Officer Durbin was not summoning medical care for Ms. Jenkins during that 11-minute-plus gap. He returns alone and shakes Ms. Jenkins in the back seat to check on her. She is totally unresponsive. FAC ¶ 57; Video at 1:24:15–1:25:00. He pulls Ms. Jenkins's body from the car, checks for a pulse, and says, "I can't tell if she's breathing or not." FAC ¶ 57. Only at this point does Officer Durbin summon the paramedics. Video at 1:25:10. He begins performing CPR, but by this time Ms. Jenkins has stopped breathing and is unconscious. FAC ¶ 57.

Paramedics soon arrive and take over efforts to resuscitate Ms. Jenkins. Video at 1:27:55. Despite their best

efforts, Ms. Jenkins never regained consciousness. She fell into a coma and died nine days later. FAC ¶ 58.

## II

J.K.J. alleges two separate claims against Officer Durbin. The first is a survival claim asserted on Ms. Jenkins's behalf that seeks to recover damages for the injuries she suffered. *See Hayes v. City of San Diego*, 736 F.3d 1223, 1228–29 (9th Cir. 2013). The second is a claim asserted on J.K.J.'s own behalf that seeks to recover damages for the injuries he has sustained (and will sustain) as a result of his mother's death. *See Moreland v. Las Vegas Metropolitan Police Department*, 159 F.3d 365, 371 (9th Cir. 1998).

The district court analyzed both claims under the Fourteenth Amendment's Due Process Clause, but only the claim asserted by J.K.J. on his own behalf is governed by the Fourteenth Amendment. The survival claim asserted on Ms. Jenkins's behalf is governed by the Fourth Amendment because she remained in the custody of the arresting officers the entire time. *See Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1098–99 (9th Cir. 2006); *Fontana v. Haskin*, 262 F.3d 871, 878–80 (9th Cir. 2001). The Fourteenth Amendment applies only after an arrestee has been booked into jail and thereby becomes, in the eyes of the law, a pre-trial detainee. But in this context, involving a claim predicated on the failure to promptly summon medical care, nothing of consequence turns on whether the person suffering a medical emergency was an arrestee or a pre-trial detainee. The standards imposed by the Fourth and Fourteenth Amendments both require a similar assessment of whether the officer's actions were objectively reasonable under the circumstances. *See Sandoval v. County of San Diego*, 985 F.3d 657, 669–70 (9th Cir. 2021) (Fourteenth

Amendment); *Tatum*, 441 F.3d at 1099 (Fourth Amendment).

The majority opinion states that it need not decide which of the two standards applies because the survival claim asserted on Ms. Jenkins's behalf fails on qualified immunity grounds. Maj. op. at 15. In my view, J.K.J. has alleged facts that easily state a claim under either standard. For simplicity's sake, I will analyze the survival claim under the Fourteenth Amendment standard, without separately analyzing the claim J.K.J. asserts on his own behalf.[5]

The discussion that follows first analyzes whether J.K.J. has adequately alleged a violation of the Fourteenth Amendment and then addresses whether Officer Durbin is shielded from liability by the doctrine of qualified immunity.

---

[5] The majority opinion holds that J.K.J. waived the claim he asserts on his own behalf, but that is not the case. Maj. op. at 20–21. J.K.J. opposed dismissal of the claim asserted on his own behalf in the district court, and he has challenged the dismissal of that claim on appeal. He did not, as the majority opinion states, concede that this claim was duplicative of the survival claim. *Id.* In the district court, J.K.J. separately analyzed the survival claim under both the Fourth and Fourteenth Amendments to accommodate the district court's erroneous assumption that the Fourteenth Amendment governed that claim, even as he insisted—correctly—that the Fourth Amendment governs instead. When opposing dismissal of the claim asserted on his own behalf, which *is* governed by the Fourteenth Amendment, he incorporated by reference the arguments he had already made under the Fourteenth Amendment in opposing dismissal of the survival claim. He further argued that none of the allegations in the first amended complaint, including the claim asserted on his own behalf, were redundant. Why the majority opinion construes this as a waiver of the claim asserted on J.K.J.'s own behalf is a complete mystery.

## A

A claim under the Fourteenth Amendment for failure to provide adequate medical care is governed by "an objective deliberate indifference standard." *Gordon v. County of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018); *see Castro v. County of Los Angeles*, 833 F.3d 1060, 1067–71 (9th Cir. 2016) (en banc). It requires a showing of the following:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined [including a decision with respect to medical treatment];

> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;

> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Sandoval*, 985 F.3d at 669 (alteration in original).

To survive a motion to dismiss, J.K.J. must allege facts "plausibly suggesting" that each of these elements is satisfied. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007). He has done so here.

As to the first element, the allegations summarized above plausibly suggest that Officer Durbin made an intentional decision concerning the conditions under which Ms. Jenkins was confined—specifically, his decision not to summon medical care at any point before she stopped breathing. During the hour-long drive to police headquarters, Officer Durbin observed Ms. Jenkins's condition deteriorate and deliberately chose not to take action in response. Nothing more than that intentional decision to refrain from acting is required, as we made clear in *Castro*. There, in the context of a claim alleging that jail officials failed to protect an inmate from a violent attack by another inmate, we held that the first element would not be satisfied "if the officer's inaction resulted from something totally unintentional," such as "an accident or sudden illness that rendered him unconscious and thus unable to monitor the cell" in which the two inmates were housed. 833 F.3d at 1070. No disabling condition of that sort rendered Officer Durbin's failure to summon medical care unintentional here. He saw and heard all the signs of medical distress Ms. Jenkins exhibited. He nevertheless made the intentional decision not to act on those observations, evidently because he thought Ms. Jenkins was "faking" her condition as a ploy to avoid going to jail.

As to the second element, J.K.J. has plausibly alleged that Officer Durbin's failure to summon medical care put Ms. Jenkins at "substantial risk of suffering serious harm." *Sandoval*, 985 F.3d at 669. Although the precise nature of what was ailing Ms. Jenkins may have been unclear, there can be no doubt that something was seriously wrong with her. When Officer Durbin first encountered Ms. Jenkins, she was able to sit upright in the back seat of a car, stand without assistance, and walk on her own. She was breathing normally and was alert and responsive when answering the

officers' questions. By the time Officer Durbin pulled over to check on her, it was clear that Ms. Jenkins was experiencing some kind of medical emergency. Her breathing had become abnormally rapid and irregular; she was screaming and moaning intermittently, followed by periods in which she may have been in and out of consciousness; and she repeatedly told Officer Durbin she was sick and pleaded for help. By the time Officer Durbin arrived at police headquarters, Ms. Jenkins's condition had deteriorated even more dramatically, as she was no longer able to sit or stand on her own or even to control the movement of her limbs to avoid injury while being removed from the car. Failing to seek medical care for Ms. Jenkins under those circumstances obviously placed her at substantial risk of suffering serious harm.

J.K.J.'s allegations satisfy the third element as well, as they plausibly suggest both that Officer Durbin failed to take reasonable available measures to abate the risk of serious harm, and that any reasonable officer in these circumstances would have recognized the high degree of risk involved. Under our precedent, this element is purely objective, so J.K.J. need not allege that Officer Durbin was subjectively aware of the risk that his failure to summon medical care posed to Ms. Jenkins. *Id.* at 678; *Gordon*, 888 F.3d at 1125 & n.4. J.K.J. need only allege facts plausibly suggesting that Officer Durbin's conduct was "objectively unreasonable." *Castro*, 833 F.3d at 1071.

The complaint's allegations, augmented by the video, plausibly suggest that during the drive to police headquarters (and certainly upon arrival there), Officer Durbin's conduct became objectively unreasonable. The signs of medical distress that Ms. Jenkins exhibited—her vomiting, moaning, screaming, irregular breathing, repeated cries for help,

inability to sit or stand on her own, and loss of control of her limbs—are far outside the range of behavior that any healthy individual would exhibit.  Any reasonable officer observing those signs would have recognized that Ms. Jenkins needed immediate medical attention.

Because the signs of Ms. Jenkins's medical distress were so obvious, Officer Durbin's failure to promptly summon medical care could be objectively reasonable only if his mistaken belief that she was "faking" her condition was itself reasonable.  An officer of course has no duty to summon medical care for someone who is merely feigning a medical emergency.  But the complaint's allegations, augmented by the video, plausibly suggest that no reasonable officer in these circumstances would have concluded that Ms. Jenkins was feigning medical distress. Nothing about Ms. Jenkins's behavior suggested that any aspect of her condition was contrived, as one can plainly see from the body camera footage.  The video alone nudges J.K.J.'s allegation that Officer Durbin's actions were objectively unreasonable "across the line from conceivable to plausible," which is all that is required at this early stage. *Twombly*, 550 U.S. at 570.

Finally, J.K.J. has also alleged facts satisfying the fourth element, which requires a showing that Officer Durbin caused Ms. Jenkins's injuries by failing to promptly summon medical care.  At least 28 minutes elapsed between the time Officer Durbin pulled over to check on Ms. Jenkins and the time he finally summoned paramedics.  Twenty minutes elapsed between his arrival at police headquarters and his call to the paramedics.  The facts alleged by J.K.J. plausibly suggest that, had Officer Durbin summoned medical care at either of those earlier junctures, Ms. Jenkins's death could have been averted.

In short, J.K.J. has stated a claim that Officer Durbin's actions were objectively unreasonable and thus violated the governing legal standards under both the Fourth and Fourteenth Amendments.

B

The remaining question is whether qualified immunity shields Officer Durbin from liability. The majority opinion concludes that it does, but that conclusion is flawed for one simple reason: An officer cannot claim qualified immunity based on an unreasonable mistake of fact, and J.K.J. has plausibly alleged here that Officer Durbin's mistake of fact as to Ms. Jenkins's medical condition was indeed unreasonable.

The Supreme Court has instructed us to analyze the issue of qualified immunity in two steps. The first focuses on whether the officer's conduct violated a constitutional right, the second on whether that right was clearly established at the time of the events in question. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). We have already addressed the first step: As discussed above, J.K.J. has plausibly alleged that Officer Durbin violated both the Fourth and Fourteenth Amendments by denying medical care to Ms. Jenkins under circumstances that rendered his conduct objectively unreasonable.

At the second step, we ask whether the legal constraints governing Officer Durbin's conduct were sufficiently clear "such that any reasonably well-trained officer would have known that his conduct was unlawful." *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020). An officer may be entitled to qualified immunity at the second step based on a mistake of fact or law, but in either scenario the mistake must be a reasonable one. *See Pearson v. Callahan*,

555 U.S. 223, 231 (2009); *Saucier*, 533 U.S. at 205; *Demuth v. County of Los Angeles*, 798 F.3d 837, 839 (9th Cir. 2015).

In this case, Officer Durbin did not make a mistake of law—that is, a mistake "as to the legal constraints on particular police conduct." *Saucier*, 533 U.S. at 205. Ms. Jenkins exhibited obvious signs that she was experiencing a serious medical emergency, and the legal constraints governing an officer's conduct in those circumstances were clearly established. Any reasonable officer would have known that failing to summon immediate medical care for an arrestee experiencing a medical emergency is unlawful. *See Sandoval*, 985 F.3d at 679–80; *Gordon*, 888 F.3d at 1124–25; *Tatum*, 441 F.3d at 1099. Thus, if Officer Durbin had correctly perceived that Ms. Jenkins's signs of medical distress were real and not contrived, he could not have made a reasonable mistake "as to the legality of [his] actions." *Saucier*, 533 U.S. at 206. What the law required in this situation was not open to debate. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (qualified immunity protects "reasonable but mistaken judgments about open legal questions").

The mistake Officer Durbin made was instead a *mistake of fact*: He mistakenly believed that Ms. Jenkins was "faking" her symptoms rather than experiencing an actual medical emergency. But as we and other courts have squarely held, if an officer's mistake of fact is unreasonable, he is not entitled to qualified immunity based on that mistake. *See, e.g.*, *Jones v. Treubig*, 963 F.3d 214, 230–31 (2d Cir. 2020); *Demuth*, 798 F.3d at 839; *Liberal v. Estrada*, 632 F.3d 1064, 1076–78 (9th Cir. 2011); *Wingrove v. Forshey*, 230 F. Supp. 2d 808, 823–24 (S.D. Ohio 2002). The dispositive question, then, is whether Officer Durbin

reasonably but mistakenly believed Ms. Jenkins's medical distress was feigned.

At this stage of the case, Officer Durbin cannot be granted qualified immunity because J.K.J. has plausibly alleged that Officer Durbin's mistake of fact was unreasonable. As noted earlier, the many objective signs of medical distress exhibited by Ms. Jenkins offered no support for the notion that she was engaged in some kind of ruse. The video alone plausibly suggests that any reasonable officer observing the dramatic decline in Ms. Jenkins's condition over the course of an hour would have realized that her vomiting, abnormally rapid breathing, inability to sit or stand, and loss of control of her limbs were all signs of a true medical emergency, not part of an elaborate act. When an officer's actions are based on an unreasonable mistake of fact, we determine whether the law governing the officer's conduct was clearly established under the facts that the officer should have correctly perceived. *See Torres v. City of Madera*, 648 F.3d 1119, 1127 (9th Cir. 2011). Under those facts here, as already discussed, Officer Durbin's actions violated Ms. Jenkins's clearly established right to have medical care summoned immediately.[6]

The preceding discussion explains why the majority opinion wrongly faults J.K.J. for failing to cite cases finding a constitutional violation in directly analogous circumstances. Maj. op. at 16–19. That failing would be relevant if we were dealing with an officer whose conduct

---

[6] It bears noting that whether Officer Durbin honestly believed that Ms. Jenkins was feigning her condition is irrelevant to the analysis. *See Torres*, 648 F.3d at 1127. The only relevant question is whether his mistaken belief was a *reasonable* one. Accepting the complaint's allegations as true, it was not.

was based on a mistake of law.  In that context, a plaintiff will often need to marshal cases involving factually analogous circumstances to show that the law was clearly established.  *Saucier*, 533 U.S. at 205.  After all, broad legal concepts that are designed to "accommodate limitless factual circumstances," such as excessive force and probable cause, can leave considerable uncertainty about "how the relevant legal doctrine . . . will apply to the factual situation the officer confronts."  *Id.*; *see, e.g.*, *Anderson v. Creighton*, 483 U.S. 635, 640–41 (1987).

No such need to marshal factually analogous cases exists when an officer's conduct is based on a mistake of fact.  The key question in that setting is whether the officer's mistake was reasonable or not—a factual issue that the jury must resolve when, as in this case, the underlying facts (or the inferences to be drawn from those facts) are in dispute.  *See Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003); *Jensen v. City of Oxnard*, 145 F.3d 1078, 1086–87 (9th Cir. 1998).**[7]**

Whether an officer's mistake of fact was reasonable is assuredly not a *legal* question, and hence the hunt for analogous cases is both unnecessary and futile.  One will

---

**[7]** The majority opinion misreads these cases, suggesting that they require factually analogous precedent establishing the unlawfulness of an officer's mistake of fact.  Maj. op. at 19 n.4.  They do not.  In both cases, we determined whether the legal constraints on an officer's conduct were clearly established under the facts that the officer reasonably should have perceived and searched for factually analogous cases in making that determination.  But with respect to the mistake of fact, we held that the "crucial question" is whether the officer's mistaken belief "was reasonable under the circumstances," an issue that had to be left to the jury to resolve.  *Wilkins*, 350 F.3d at 955; *see also Jensen*, 145 F.3d at 1086–87.

search the pages of the Federal Reporter in vain looking for guidance on whether a particular collection of facts shows that someone is suffering a real as opposed to a feigned medical emergency. Deciding the reasonableness of an officer's mistake as to *that* issue requires drawing on common sense and everyday lived experience rather than a study of legal precedents, which is precisely why resolution of the issue is entrusted to juries in the first place.

The majority opinion's characterization of this case as one concerning a mistake of law—in which Officer Durbin was "mistaken about his *legal obligations* on summoning medical care when an arrestee is experiencing a non-obvious medical emergency"—cannot be squared with the record. Maj. op. at 19 n.4 (emphasis added). Officer Durbin did not, as the majority opinion suggests, make a mistake as to whether the law required him to summon medical care because the signs of medical distress Ms. Jenkins exhibited were "non-obvious." As the video confirms, those signs were as obvious as could be; Officer Durbin decided to ignore them because he thought (incorrectly) that she was "faking" her condition. *See, e.g.*, Video at 1:23:20–1:23:35. Whether his mistake of fact was reasonable cannot be resolved at the motion-to-dismiss stage.[8]

---

[8] Even if we accept the majority opinion's erroneous insistence on the need for a factually analogous case establishing the obviousness of Ms. Jenkins's medical emergency, we have one. In *Sandoval*, our court made clear that the right to adequate medical care was clearly established in circumstances highly analogous to—and indeed, less dire than—those presented in this case. There, we held that by 2014 "failing to provide any meaningful treatment" to a detainee "who was sweating and appeared so tired and disoriented that a deputy urged that he be re-evaluated" violated clearly established law, such that any reasonable official would know that such conduct violated the Constitution.

\*    \*    \*

In sum, the district court erred by dismissing J.K.J.'s claims against Officer Durbin.  J.K.J. has adequately pleaded both a survival claim on Ms. Jenkins's behalf under the Fourth Amendment and a claim on his own behalf under the Fourteenth Amendment.   We should have reversed the dismissal of those claims and remanded for further proceedings.

---

985 F.3d at 680.  The same is necessarily true for failing to provide any medical treatment to Ms. Jenkins based on her symptoms of vomiting, irregular breathing, repeated cries for help, inability to sit or stand, and loss of control of her own limbs.  In November 2018, any reasonable officer would have known, based on the clearly established law in this circuit, that ignoring these obvious signs of medical distress would violate Ms. Jenkins's constitutional rights.